722 A.2d 598 (1999)
317 N.J. Super. 496
Amir BYRD, an infant by his Guardians Ad Litem, Herman BYRD and Sharon Byrd, Herman Byrd and Sharon Byrd, Individually, Plaintiffs-Appellants,
v.
Eugene BLUMENREICH, Dorothy Blumenreich, and David Blumenreich, Defendants/Third-Party Plaintiffs-Cross-Appellants,
v.
Pennsylvania National Mutual Casualty Insurance Company, Defendant/Third-Party Defendant-Respondent/Cross-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted December 16, 1998.
Decided February 2, 1999.
Michael A. Querques, Orange, for plaintiffs-appellants (Mr. Querques, of counsel; Anthony Scordo, on the brief).
Manta and Welge, for defendant/third-party defendant-respondent/cross-respondent (Peter F. Rosenthal, Philadelphia, PA, of counsel; Walter A. Stewart, on the brief).
Edward A. Berger, for defendants/third-party plaintiffs-cross-appellants.
Before Judges CONLEY, A.A. RODRÍGUEZ and KIMMELMAN.
The opinion of the court was delivered by KIMMELMAN, J.A.D.
This is a lead pollution case where it is claimed that the infant plaintiff sustained injuries from ingesting, breathing, or being exposed to lead chips and dust flaking off the lead paint in his parents' apartment. Third-party defendant Pennsylvania National Mutual Casualty Insurance Company (Penn National), which was the insurer of defendant landlord, denied coverage pursuant to what is known as the absolute pollution exclusion clause of its policy. Defendant landlords *599 filed a third-party complaint for a declaratory judgment that Penn National was obligated to defend and indemnify them against the infant plaintiff's claim. Their complaint was dismissed in response to an application for summary judgment made by Penn National. Plaintiffs' direct claim made against Penn National was also denied and their complaint was dismissed with prejudice as against Penn National. Their complaint against defendant landlords remained. We granted leave to appeal and now reverse.
The infant plaintiff, then aged nine months to three years/nine months old, lived with his parents while they were tenants from November 1991 through November 1994 in an apartment in a multi-family dwelling owned by defendant landlords in East Orange, New Jersey. It is charged that defendant landlords knew or should have known that the paint in the apartment was lead based and that it was peeling and flaking to the degree where it created the risk of injury. The infant plaintiff is alleged to have ingested the flaking and peeling paint causing him to suffer lead poisoning and damage to his brain and central nervous system. Claims as to negligence, gross, reckless, and wanton conduct, breach of contract, breach of warranty of habitability, breach of quiet enjoyment, and public nuisance were made against defendant landlords.
Penn National declined to provide a defense to the claim made against defendant landlords. Their policy issued to defendant landlords had stamped on the declaration page in large letters the words: POLLUTION COVERAGE EXCLUDED. The pertinent language of the policy provided:
This insurance does not apply to:
f. (1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:
(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;
(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;
(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or
(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:
(i) If the pollutants are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor; or
(ii) If the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants.
Subparagraphs (a) and (d)(i) do not apply to "bodily injury" or "property damage" arising out of heat, smoke, or fumes from a hostile fire.
As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.
(2) Any loss, cost or expense arising out of any:
(a) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or
(b) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.
Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.
*600 This pollution exclusion clause is uniformly used by the insurance industry in general commercial liability policies. See Stoney Run Co. v. Prudential-LMI Commercial Ins. Co., 47 F.3d 34, 36 (2nd Cir.1995).
Our concern focuses on what we deem to be the nub of the controversy: whether injury caused by the ingestion of the flaking and peeling lead paint chips arises "out of the actual ... discharge, dispersal, seepage, migration, release or escape of pollutants" within the meaning of such exclusion. At best, we find the policy ambiguous in respect to this particular factual issue.
It is often posited that the average purchaser is entitled to the broadest measure of protection necessary to fulfill his/ her reasonable expectations to the extent that a fair reading of the policy will allow. Kievit v. Loyal Protective Life Ins. Co., 34 N.J. 475, 482, 170 A.2d 22 (1961); Kopp v. Newark Ins. Co., 204 N.J.Super. 415, 420, 499 A.2d 235 (App.Div.1985). Of course, the fair reading of the policy must be tempered by the well-settled principle that an exclusionary clause designed to limit the protection afforded by the general coverage provisions of the policy must be strictly construed. Butler v. Bonner & Barnewall, Inc., 56 N.J. 567, 576, 267 A.2d 527 (1970); Mazzilli v. Accident & Cas. Ins. Co. of Winterthur, 35 N.J. 1, 8, 170 A.2d 800 (1961); Kopp, supra, 204 N.J.Super. at 420, 499 A.2d 235. Equally well-settled is the principle that if there is any doubt, uncertainty, ambiguity, or phraseology that is reasonably susceptible to two interpretations, the construction offering coverage is to be adopted. Linden Motor Freight Co., Inc. v. Travelers Ins. Co., 40 N.J. 511, 525, 193 A.2d 217 (1963); Hunt v. Hospital Service Plan of New Jersey, 33 N.J. 98, 102, 162 A.2d 561 (1960); Kook v. American Sur. Co. of New York, 88 N.J.Super. 43, 52, 210 A.2d 633 (App.Div.1965).
While our courts have dealt with the absolute pollution exclusion clause in the context of toxic pollutants released into the outdoor environment and have generally found the exclusionary clause to be clear and unambiguous, see United States Bronze Powders v. Commerce and Indus. Ins., 259 N.J.Super. 109, 118, 611 A.2d 667 (Law Div.1992), aff'd, 293 N.J.Super. 12, 16, 679 A.2d 674 (App.Div. 1996); Harvard Indus., Inc. v. Aetna Cas. & Sur. Co., 273 N.J.Super. 467, 481, 642 A.2d 438 (Law Div.1993); Nunn v. Franklin Mut. Ins. Co., 274 N.J.Super. 543, 551, 644 A.2d 1111 (App.Div.1994); A & S Fuel Oil Co. v. Royal Indem. Co., 279 N.J.Super. 367, 371, 652 A.2d 1236 (App.Div.), certif. denied, 141 N.J. 98, 660 A.2d 1196 (1995); Kimber Petroleum Corp. v. Travelers Indem. Corp., 298 N.J.Super. 286, 304, 689 A.2d 747 (App.Div.), certif. denied, 150 N.J. 26, 695 A.2d 669 (1997); no New Jersey case has dealt with the precise issue of whether the pollution exclusion clause excludes coverage for claims resulting from exposure to chips and dust flaking from lead-based paint in a private residence.
Several other jurisdictions have recently interpreted pollution exclusion clauses similar to the one at issue here in the context of exposure to lead paint chips and dust in a residential setting. The majority have held that the pollution exclusion clause either does not apply or is ambiguous in such setting. See Sphere Drake Ins. Co. v. P.L.C. Realty Co., 990 F.Supp. 240, 243 (S.D.N.Y.1997); Lefrak Organization, Inc. v. Chubb Custom Ins. Co., 942 F.Supp. 949, 954 (S.D.N.Y. 1996); Sullins v. Allstate Ins. Co., 340 Md. 503, 667 A.2d 617, 624 (Md.Ct.App.1995); Atlantic Mut. Ins. Co. v. McFadden, 413 Mass. 90, 595 N.E.2d 762, 764 (Mass.1992); Generali-US Branch v. Caribe Realty Corp., 160 Misc.2d 1056, 612 N.Y.S.2d 296, 299 (Sup.Ct. 1994). See also Weaver v. Royal Ins. Co. of America, 140 N.H. 780, 674 A.2d 975, 978 (N.H.) (which involved the ingestion of lead paint particles flaking by an infant from the clothing of his father who was a painter).
Both Sphere Drake, supra, and Lefrak, supra, involved injury caused to a minor by the ingestion or inhaling of flaking lead paint chips in residential apartments, and both cases involved the issue of insurance coverage under policies with pollution exclusion clauses identical to the clause at issue in Penn National's policy. See Sphere Drake, supra, 990 F.Supp. at 242-43; Lefrak, supra, 942 F.Supp. at 950-51.
*601 In rejecting the insurer's reliance on the pollution exclusion clause, the court in Lefrak concluded that lead paint was not included within the pollution exclusion clause and that the ordinary policyholder would read the wording of the clause as applying to environmental pollution only. Lefrak, supra, 942 F.Supp. at 953. Pollution occurring indoors was not deemed to be environmental. Ibid.
The court in Sphere Drake concluded that the ingestion or inhalation of lead paint that had flaked over time as being something other than the "discharge, dispersal, release or escape" of a pollutant and following earlier the holding in Lefrak, supra, regarded the definition of pollution in the exclusion clause to be suggestive of industrial and environmental pollution. Sphere Drake, supra, 990 F.Supp. at 244-45.
In Sullins, supra, which also involved the ingestion or inhaling by an infant of lead paint chips or flakes in her mother's apartment and where defendant landlord's insurance policy contained a similar pollution clause excluding from coverage bodily injury resulting from the "discharge, dispersal, release or escape" of pollutants, the court reasoned that a reasonably prudent layperson would interpret such words to contemplate an active discharge, dispersal, release, or escape and would not contemplate lead paint, which when applied was a legal use, where the chipping or flaking thereof does not happen intentionally. The policy language was, thus, held to be ambiguous and was construed against the insurance company and in favor of coverage. Sullins, supra, 667 A.2d at 624.
In Atlantic Mutual Insurance Co. v. McFadden, cited with approval by the Maryland Court of Appeals in Sullins, supra, the facts and legal issues again parallel this case. Two children suffered lead poisoning from the paint in their parents' apartment. McFadden, supra, 595 N.E.2d at 763. The insurer sought a declaration that it had no duty to defend against the lead poisoning claim. The pollution exclusion provision and definition of "Pollutant" was identical to the clause in Penn National's policy. See Id. at 765-66. The trial judge ruled that there was no language in the policy suggesting that lead in paint was a pollutant within the definition and if the policy could be read to imply that lead in paint was a pollutant, then the provision was ambiguous and such ambiguity must be resolved against the insurer. Id. at 764. On appeal, the trial court was affirmed. Ibid. The Supreme Judicial Court of Massachusetts disagreed with the insurer's contention that lead in paint, although not specifically listed in the pollution exclusion as a contaminant or irritant, fell within either or both of those categories. Lead paint was held to be not directly classified as a pollutant. The Court said:
When construing language in an insurance policy, we "consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." We conclude that an insured could reasonably have understood the provision at issue to exclude coverage for injury caused by certain forms of industrial pollution, but not coverage for injury allegedly caused by the presence of leaded materials in a private residence. There simply is no language in the exclusion provision from which to infer that the provision was drafted with a view toward limiting liability for lead paint-related injury. The definition of "pollutant" in the policy does not indicate that leaded materials fall within its scope. Rather, the terms used in the pollution exclusion, such as "discharge," "dispersal," "release," and "escape," are terms of art in environmental law which generally are used with reference to damage or injury caused by improper disposal or containment of hazardous waste.

[Id. at 764 (citations omitted).]
Generali-US Branch, supra, also involved an infant's poisoning by the ingestion of lead paint chips where defendant landlord's policy again contained the identical pollution exclusion clause. In concluding that the policy did not bar coverage, the court reasoned that the words "discharge," "dispersal," "release", or "escape" are terms of art in environmental law used with reference to damage or injury caused by an active event triggering environmental pollution. 612 N.Y.S.2d at 299.
*602 To the contrary is St. Leger v. American Fire and Casualty Insurance Co., 870 F.Supp. 641, 643 (E.D.Pa.1994), aff'd without opinion, 61 F.3d 896 (3rd Cir.1995), where lead poisoning occurring as a result of the inhaling or ingestion of lead dust in an apartment was held to be excluded from coverage. The court deemed lead to be classified as a pollutant since lead irritates and contaminates. Similarly in United States Liability Insurance Co. v. Bourbeau, 49 F.3d 786, 790 (1st Cir.1995), damages caused by the contamination of the soil surrounding a building by lead chips where old paint was being removed were held to be precluded from coverage by the absolute pollution clause. The court reasoned, however, that while lead paint released into or upon land was to be deemed environmental pollution, such circumstance was to be distinguished from injury caused by the presence of lead paint in a household as in McFadden, supra. The court did not regard lead poisoning damage occurring within a household as constituting environmental pollution. 49 F.3d at 789.
Also to the contrary is Oates by Oates v. State, 157 Misc.2d 618, 597 N.Y.S.2d 550, 553-555 (Ct.Cl.1993), involving facts similar to the instant case but where insurance coverage was rejected. In Oates, the landlord filed a third-party complaint against its insurer for a declaration of coverage. Ibid. The policy had the identical pollution exclusion clause as here. See Ibid. The insurer's application for summary judgment was granted, the court opining that the only reasonable interpretation was that the clause "is just what it purports to beabsolute...." and "it excludes any and all personal injuries resulting from pollutants released at or from the insured's premises whether intentional or not." Id. at 553. The appeal in Oates was withdrawn after settlement. 206 A.D.2d 979, 615 N.Y.S.2d 993 (App.Div.1994).
The reasoning of Oates, however, was rejected by the New York Supreme Court in Generali-US Branch, and by the United States District Court for the Southern District of New York in both Sphere Drake, supra and Lefrak, supra.
As a consequence, we consider the weight of authority in other jurisdictions to construe the language "discharge, dispersal, release or escape" of pollutants in an identical pollution exclusion clause either as limited to environmental damage or injury caused by improper disposal or containment of hazardous wastes or as simply ambiguous in the absence of specific language excluding from coverage injury or damage caused by the indoor residential exposure to lead paint. We agree with the latter view.
Penn National's pollution exclusion clause was not expressly worded to exclude injury or damage sustained from exposure to chips, flakes, or dust emanating from lead paint applied to the interior walls or woodwork of a residence. Each of the words contained in the pollution exclusion clause "discharge, dispersal, release or escape" as ordinarily understood by all, imply an active or clearly perceived physical event. See Webster's Third New International Dictionary (1966) (defining terms as such). Such words, especially when used together, are not ordinarily understood to apply to the imperceptible chipping or flaking of lead paint which is attributable, not to an active or physical event, but rather to an involuntary effect occurring over a considerable period of years.
Accordingly, we conclude that Penn National's absolute pollution exclusion clause is uncertain or ambiguous and susceptible to differing interpretations as to whether a claim for personal injury caused by the indoor residential ingestion of lead paint chips, flakes, or dust is excluded from coverage. Such uncertainty or ambiguity is fatal to Penn National's position.
Accordingly, the summary judgment rendered January 26, 1998, in favor of Penn National is reversed. The matter is remanded for further proceedings consistent with this opinion.