801 A.2d 419 (2002)
353 N.J. Super. 67
LEO HAUS, INC. and Mati Haus, Plaintiffs-Appellants,
v.
SELECTIVE INSURANCE, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued June 5, 2002.
Decided July 5, 2002.
Valter H. Must, Lakewood, argued the cause for appellants (Rothstein, Mandell, Strohm, Must & Gertner, attorneys; Mr. Must, on the brief).
Gary S. Kull, Gladstone, argued the cause for respondent (Carroll, McNulty & Kull, attorneys; Mr. Gull and James W. Gunson, of counsel and on the brief).
Before Judges A.A. RODRÍGUEZ,[1] LEFELT and LISA.
The opinion of the court was delivered by *420 LISA, J.A.D.
We consider in this case whether a pollution exclusion provision in a home builder's commercial liability insurance policy applies to personal injuries suffered by the homeowners when the home's heating units discharged carbon monoxide over a one year period. On cross-motions for summary judgment, the trial judge granted the motion of defendant, Selective Insurance, thereby upholding the applicability of the exclusion, and denied the motion of plaintiffs, Leo Haus, Inc. and its principal, Mati Haus (collectively referred to as "Haus"), which sought coverage. Haus now appeals. We affirm.
The undisputed facts in this coverage suit are derived from the allegations in the homeowners' suit against Haus: Haus built a new home for Arthur and Christine Aria. A certificate of occupancy was issued on February 12, 1998, and the Arias took occupancy in March 1998. The heating units installed in the home caused substantial toxic levels of carbon monoxide to enter the home's living areas. The Arias suffered from carbon monoxide poisoning from March 1998 until the problem with the heating units was discovered in March 1999. The Arias are both surgeons. As a result of the carbon monoxide poisoning, Dr. Christine Aria contends she has suffered a neurological disorder that may be permanent, and which has rendered her totally disabled to perform as a surgeon. Dr. Arthur Aria contends he has also suffered severe personal injuries, temporary and permanent, including high blood pressure, flu-like symptoms and severe headaches.
The Arias sued Haus and others, including the architect and the manufacturer and installer of the heating units. Haus reported the suit to Selective and demanded defense and indemnification. At all applicable times Haus was the holder of a commercial liability policy issued by Selective. Selective denied coverage because its policy contained an endorsement, captioned in large bold print letters: "POLLUTION EXCLUSION (LIMITED FORM) THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY," which provides:
We shall have no obligation under this coverage part:
a. to investigate, settle or defend any claim or suit against any insured alleging actual or threatened injury or damage of any nature or kind to persons or property which:
1. arises out of the "pollution hazard;" or
2. would not have occurred but for the "pollution hazard;" or
b. to pay any damages, judgments, settlements, losses, costs or expenses of any kind or nature that may be awarded or incurred by reason of any such claim or suit or any such actual or threatened injury or damage; or
c. for any losses, costs or expenses arising out of any obligation, order, direction or request of or upon any insured or others, including but not limited to any governmental obligation, order, direction or request, to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize, in any way respond to, or assess the effects of "pollutants."
"Pollutants" means any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.
"Pollution hazard" means an actual exposure or threat of exposure to the corrosive, toxic or other harmful properties *421 of any "pollutants" arising out of the discharge, dispersal, seepage, migration, release or escape of such "pollutants."
....
Parts a. and b. of this exclusion do not apply to:
....
B. Injury or damage arising from the actual discharge or release of any "pollutants" that takes place entirely inside a building or structure if:
1. the injury or damage is the result of an exposure which takes place entirely within a building or structure; and
2. the injury or damage results from an actual discharge or release beginning and ending within a single forty-eight (48) hour period; and
3. the exposure occurs within the same forty-eight (48) hour period referred to in 2. above; and
4. within thirty (30) days of the actual discharge or release:
a. the company or its agent is notified of the injury or damage in writing; or
b. in the case of "bodily injury," the "bodily injury" is treated by a physician, or death results, and within ten (10) additional days, written notice of such injury or death is received by the company or its agents.
Strict compliance with the time periods stated above is required for coverage to be provided.
Judge Gilroy found these terms to be clear and unambiguous and found they apply to the facts presented, thereby excluding coverage. Haus argues the provisions are ambiguous, and must be construed in favor of the policyholder.
The principles of construction of insurance contracts are well settled. Fundamentally, an insurance contract, like any other contract, will be enforced as written. Clear and unambiguous terms of an insurance policy, therefore, need no further source of construction to merit their enforcement. Insureds are entitled, however, "to the broad measure of protection necessary to fulfill their reasonable expectations." Kievit v. Loyal Protective Life Ins. Co., 34 N.J. 475, 482, 170 A.2d 22 (1961). Coverage is thus afforded "to the full extent that any fair interpretation will allow." Ibid. (citations omitted). Therefore, in the event of an ambiguity in policy provisions that is reasonably susceptible to two interpretations, the construction resulting in coverage will be applied. Linden Motor Freight Co., Inc. v. Travelers Ins. Co., 40 N.J. 511, 525, 193 A.2d 217 (1963). Exclusionary provisions, because they are designed to restrict coverage, will be interpreted strictly. Butler v. Bonner & Barnewall, Inc., 56 N.J. 567, 576, 267 A.2d 527 (1970). Nevertheless, "exclusions are presumptively valid and will be given effect if `specific, plain, clear, prominent, and not contrary to public policy.'" Princeton Ins. Co. v. Chunmuang, 151 N.J. 80, 95, 698 A.2d 9 (1997) (citing Doto v. Russo, 140 N.J. 544, 659 A.2d 1371 (1995)).
In light of these principles, we consider the terms of the pollution exclusion. Coverage is excluded for "injury" "to persons" which "arises out of the `pollution hazard,' "which "means an actual exposure... to the ... toxic or other harmful properties of any `pollutants' arising out of the discharge, dispersal, seepage, migration, release or escape of such `pollutant.'" "Pollutants" are defined to include any "gaseous ... contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." Here, carbon monoxide, *422 a gaseous contaminant, was discharged, dispersed, released or escaped into the living areas of the home, causing injury to the Arias.
Against the apparent clarity of the provision and its applicability, Haus argues the provision is not intended to apply to a residential setting. He relies on Byrd v. Blumenreich, 317 N.J.Super. 496, 722 A.2d 598 (App.Div.1999). We there considered "whether injury caused by the ingestion of the flaking and peeling lead paint chips arises `out of the actual ... discharge, dispersal, seepage, migration, release or escape of pollutants' within the meaning of [the policy] exclusion." Id. at 499, 722 A.2d 598. We determined that, at best, the policy was ambiguous "in respect to this particular factual issue." Ibid.
In our analysis, we first noted that the pollution exclusion clause was repeatedly found to be clear and unambiguous in the context of toxic pollutants released into the outdoor environment. Id. at 500, 722 A.2d 598. We then considered whether such clarity should pertain when dealing with a small child ingesting flaking and peeling lead-based paint in a private residence. After discussing the analysis of this issue by courts in other jurisdictions, we determined the "weight of authority" is to construe the language "discharge, dispersal, release or escape" of pollutants "either as limited to environmental damage or injury caused by improper disposal or containment of hazardous wastes or as simply ambiguous in the absence of specific language excluding from coverage injury or damage caused by the indoor residential exposure to lead paint." Id. at 504, 722 A.2d 598.
We accepted the second proposition, but not the first. Ibid. We therefore did not base our determination on the premise that the policy provision applies only to discharge, dispersal, release or escape of pollutants caused by improper disposal or containment of hazardous wastes. Instead, we found the provision ambiguous because of the absence of specific language dealing with residential exposure to lead paint. This is because the terms "discharge, dispersal, release or escape" are all commonly understood to relate to an active or clearly perceived event, and not to the imperceptible chipping or flaking of lead paint which merely occurs over a period or years. Id. at 504-05, 722 A.2d 598. Because of the ambiguity as applied to those specific facts, the interpretation favoring coverage was adopted.
In the factual complex before us, however, the Byrd infirmity does not exist. The pollutant was actively discharged, dispersed, released or escaped from the heating units. The substance in question, carbon monoxide, is indeed within the express definition of "pollutant" in the policy, namely a "gaseous ... contaminant" including "vapor, soot [and] fumes." We are satisfied that Byrd is materially distinguishable from the case before us and does not control its disposition. We do not deem the residential or indoor aspects of the facts in Byrd to be critical to its rationale.
We find a further basis for distinction in the exception in the Selective pollution exclusion. We are not dealing here with an "absolute" pollution exclusion. Injury resulting from discharge or release of a pollutant is not excluded from coverage if (1) the exposure occurred entirely within a building or structure, (2) the discharge or release occurred within a forty-eight hour period, (3) the exposure occurred within the same forty-eight hour period, and (4) Selective is given notice within thirty days and medical treatment or death occurs within ten days. The presence of this provision bolsters our conclusion that the exclusion does generally contemplate exposure *423 within a building which does not meet these four criteria.
The kind of occurrence that befell the Arias falls squarely within the terms of Selective's pollution exclusion. That provision has been generally held to be clear and unambiguous, and it is clear and unambiguous within the context of the fact pattern before us. We perceive no reason to accept the proposition that the Byrd court declined to adopt, namely that the pollution exclusion cannot apply in any context except for injuries resulting from improper disposal or containment of hazardous wastes. Such a construction is inconsistent with the clear terms of the exclusion provision. We instead adhere to our traditional rule of construction that in the absence of an ambiguity the policy will be enforced as written.
We are sensitive to the argument that general notions of "pollution" relate to industrial discharges and environmental contamination and castastrophes. The policy provisions, however, nowhere mention such terms and do not, expressly or impliedly, limit the exclusion to such circumstances. Of particular significance is the limitation which Selective's policy does include, namely for a short term exposure occurring entirely within a building or structure. By excepting such an event from the broader exclusion, no reasonable policyholder would believe that coverage for a long term exposure within a building or structure was not excluded. We cannot rewrite the policy. We conclude that this policy is clear intrinsically and in its application to the facts of this case.
Affirmed.
NOTES
[1] Judge Rodríguez did not participate in oral argument. However, with the consent of counsel he has joined in this opinion. R. 2:13-2(b).