869 A.2d 929

NAV–ITS, INC., PLAINTIFF–APPELLANT AND CROSS–RESPON-DENT, v. SELECTIVE INSURANCE COMPANY OF AMERICA, DEFENDANT–RESPONDENT AND CROSS–APPELLANT.

Argued January 4, 2005—Decided April 7, 2005.

*Ellis I. Medoway,* argued the cause for appellant and cross-respondent (*Archer & Greiner,* attorneys; *Mr. Medoway* and *Arthur H. Jones, Jr.,* on the briefs).

*Gary S. Kull,* argued the cause for respondent and cross-appellant (*Carroll McNulty & Kull,* attorneys).

*Wendy L. Mager,* submitted a brief on behalf of *amicus curiae* Complex Insurance Claims Litigation Association (*Smith, Stratton, Wise, Heher & Brennan,* attorneys).

Justice WALLACE delivered the opinion of the Court.

This case concerns the applicability of a pollution exclusion provision in a commercial general liability insurance policy. The question presented is whether the exclusion for injuries caused by the "discharge, dispersal, release or escape of pollutants" bars coverage for personal injury allegedly caused by the exposure to toxic fumes that emanated from a floor coating/sealant operation performed by the insured. An exception to the pollution exclusion allows coverage where the injury takes place inside a building "within a single 48–hour period and the exposure occurs within the same 48–hour period." We conclude that the pollution exclusion provision applies to traditional environmental pollution claims and is not a bar to coverage in this case.

I.

The material facts are relatively simple. Plaintiff NAV–ITS, Inc. (Nav–Its), is a construction contractor specializing in tenant "fit-out" work, including the building of partitions, the laying of

concrete, the installation of doors, and the application of finishes, such as paint, sealants, and coatings.

On April 22, 1998, Nav–Its entered into a contract to perform fit-out work at the Parkway Shopping Center (Center) in Allentown, Pennsylvania. Nav–Its obtained Comprehensive General Liability (CGL) insurance coverage for its activities at the Center from defendant Selective Insurance Company of America (Selective). Nav–Its hired T.A. Fanikos Painting (Fanikos) as a subcontractor on the project to perform painting, coating and floor sealing work. Fanikos performed that work from July 27 to August 5, 1998. During that time, Dr. Roy Scalia, a physician with office space in the Center, was allegedly exposed to fumes that were released while Fanikos performed the coating/sealant work. As a result of that exposure, Dr. Scalia suffered from nausea, vomiting, lightheadedness, loss of equilibrium, and headaches. He sought medical treatment in September 1998.

In December 2000, Dr. Scalia filed a complaint against Nav–Its and several others for personal injuries arising out of his exposure to fumes at his office from July 27 through July 31, 1998, and from August 3 through August 5, 1998. Nav–Its forwarded the complaint to Selective, seeking defense and indemnification. Relying on the pollution exclusion in its policy, Selective refused to provide coverage to Nav–Its. Dr. Scalia's case against Nav–Its was subsequently resolved through binding arbitration.

Nav–Its then commenced the present action against Selective, seeking a declaratory judgment that Selective was obligated to defend and indemnify it in connection with the underlying personal injury action. Nav–Its also sought reimbursement for the costs incurred in defending the suit filed by Dr. Scalia.

Early in the litigation, Selective moved for summary judgment, and Nav–Its filed a cross-motion for partial summary judgment. The trial court denied Selective's motion and granted partial summary judgment in favor of Nav–Its, finding that Selective had an obligation to defend and indemnify Nav–Its in accordance with its insurance policy. The trial court concluded that Nav–Its had a

reasonable expectation that liability arising out of normal painting operations would be covered under the policy. Selective moved for reconsideration, but once again the trial court denied relief. In a written decision, the trial court expanded its reasoning and concluded that the pollution exclusion clause in the policy applied only to traditional environmental pollution claims.

Meanwhile, on July 5, 2002, the Appellate Division decided *Leo Haus, Inc. v. Selective Insurance*, 353 *N.J.Super.* 67, 801 *A.*2d 419 (App.Div.2002). The panel found that the pollution exclusion clause, similar to the one in the present case, was clear and unambiguous and barred coverage for the plaintiff's injury claim caused by the release of carbon monoxide gas from a defective heater over a one-year period. *Id.* at 72–73, 801 *A.*2d at 422. Selective again moved for reconsideration based on the *Leo Haus* decision and sought a stay of the award of attorney's fees. The trial court, relying on *S.N. Golden Estates, Inc. v. Continental Casualty Co.*, 293 *N.J.Super.* 395, 680 *A.*2d 1114 (App.Div.1996), which it read to limit the application of a similar pollution exclusion to environmental claims, denied reconsideration. The trial court also found that the exception to the exclusion applied because Dr. Scalia suffered individual exposures every day he entered his office, namely that each exposure began and ended in a less than forty-eight hour period.

Nav–Its's motion for additional attorney's fees and for the release of funds that had previously been deposited by Selective was granted. The trial court ordered the release of all deposited funds to Nav–Its within forty-five days. Selective appealed and a stay of the order to release the funds was granted.

On appeal, in an unpublished opinion, the Appellate Division reversed, finding that pollution exclusion clauses are not necessarily limited to the clean up of traditional environmental damage. Nevertheless, the panel found that a jury must decide whether each period of time that Dr. Scalia was at work represented a separate exposure of less than forty-eight hours, or one continuous period of exposure. The panel also left to the jury the question of

whether Nav–Its violated the thirty-day notice provision in the policy. We granted Nav–Its' petition for certification and Selective's cross-petition. *NAV–ITS, Inc. v. Selective Ins. Co. of Am.,* 181 *N.J.* 286, 854 *A.*2d 920 (2004).

## II.

Selective's insurance policy provided CGL coverage for Nav–Its for the period May 7, 1998, through May 7, 1999. The policy provided in the "Coverages" section that it "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." Further, Selective was required to defend any suit seeking those damages. The policy contained a pollution exclusion endorsement that provided in relevant part:

[Selective] shall have no obligation under this coverage part:

a. to investigate, settle or defend any claim or suit against any insured alleging actual or threatened injury or damage of any nature or kind of persons or property which:

1. arises out of the 'pollution hazard:' or

2. would not have occurred but for the 'pollution hazard:' or

b. to pay any damages, judgments, settlements, losses, costs or expenses of any kind or nature that may be awarded or incurred by reason of any such claim or suit or any such actual or threatened injury or damage; or

c. for any losses, costs or expenses arising out of any obligation, order, direction or request of or upon any insured or others, including but not limited to any governmental obligation, order, direction or request, to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize, in any way respond to, or assess the effects of 'pollutants.'

The policy defined pollutants as "any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." Under the policy, "[w]aste includes materials to be recycled, reconditioned or reclaimed." It also defined "Pollution Hazard" to mean "an actual exposure or threat of exposure to the corrosive, toxic or other harmful properties of any 'pollutants' arising out of the discharge, dispersal, seepage, migration, release or escape of such 'pollutants.' "

The policy also contained a limited exception to the pollution exclusion. That exception provided that the pollution exclusion does not apply to:

B. Injury or damage arising from the actual discharge or release of any "pollutants" that takes place entirely inside a building or structure if:

 1. the injury or damage is the result of an exposure which takes place entirely within a building or structure; and

 2. the injury or damage results from an actual discharge or release beginning and ending within a single forty-eight (48) hour period; and

 3. the exposure occurs within the same forty-eight (48) hour period referred to in 2. above; and

 4. within thirty (30) days of the actual discharge or release:

 a. the company or its agent is notified of the injury or damage in writing; or

 b. in the case of 'bodily injury,' the 'bodily injury' is treated by a physician, or death results, and within ten (10) additional days, written notice of such injury or death is received by the company or its agents.

Strict compliance with the time periods stated above is required for coverage to be provided.

## III.

## A.

Nav–Its contends that there are conflicting Appellate Division decisions on the issue of whether a pollution exclusion bars coverage for nontraditional environmental pollution claims. Nav–Its notes that different panels of the Appellate Division considered that issue in *Golden Estates, supra,* 293 *N.J.Super.* 395, 680 *A.*2d 1114, *Byrd ex rel. Byrd v. Blumenreich,* 317 *N.J.Super.* 496, 722 *A.*2d 598 (App.Div.1999), and *Leo Haus, supra,* 353 *N.J.Super.* 67, 801 *A.*2d 419, and reached conflicting results. Nav–Its urges that the reasoning in *Golden Estates,* that the applicability of the pollution exclusion clause should be limited to traditional environmental type claims is both more persuasive and consistent with the majority of decisions from other jurisdictions. Nav–Its adds that its position is also consistent with its reasonable expectations that coverage would be provided for claims arising from the normal work of the insured for which it was seeking insurance coverage, and that the purpose of the pollution exclusion was to

preclude coverage for claims involving environmental contamination.

As a secondary position, Nav–Its argues that even if the pollution exclusion is interpreted to exclude nontraditional environmental pollution claims, Dr. Scalia's underlying claim nevertheless comes within the exception to the pollution exclusion. Nav–Its contends that because the application of paint or sealant began each workday during the relevant period and ended that same day, each discharge began and ended "within a single forty-eight (48) hour period" and therefore the exception is satisfied.

Finally, Nav–Its urges that the notice issue was waived because Selective did not timely raise it in the answer to the complaint but rather admitted that Nav–Its provided timely notice to Selective of the underlying claims.

## B.

Selective counters with the argument that the pollution exclusion by its plain terms is not limited to traditional environmental claims. It claims that insurance companies and policyholders are entitled to have their rights protected by the courts, and when insurance companies draft clear, unambiguous policies, the policy should be enforced as written. It contends that a careful reading of the three Appellate Division cases that Nav–Its asserts are in conflict reveals that they are in harmony with each other and consistent in their approach to the interpretation of insurance policies. Selective points out that its policy is not an absolute pollution exclusion because it contains a forty-eight hour exception, thereby rendering the exclusion consistent with barring nontraditional environmental claims that do not fit within the exception. Further, Selective asserts that the facts of Dr. Scalia's claim show that the release of the toxic fumes did not result from a discharge "beginning and ending within a single forty-eight hour period", and that the exposure to the toxic substances did not occur within that same forty-eight hour period. Simply put, Selective argues that the analysis of the forty-eight hour exception

should not be reached unless there has been a release "beginning and ending within a single forty-eight hour period."

Lastly, Selective argues that Nav–Its's claim must be rejected because Nav–Its failed to strictly comply with the thirty-day notice requirement. Selective notes that because it was not required to include the forty-eight hour exception in its pollution exclusion, it should not be penalized for doing so "by being saddled with a prejudice requirement" regarding notice.

## IV.

The central question presented in this case is whether we should limit the applicability of the pollution exclusion clause to traditional environmental pollution claims. We begin our analysis by noting the often-stated principles for interpretation of insurance policy language.

Generally, "[w]hen interpreting an insurance policy, courts should give the policy's words 'their plain, ordinary meaning.'" *President v. Jenkins,* 180 *N.J.* 550, 562, 853 *A.*2d 247, 254 (2004) (citation omitted). If the policy language is clear, the policy should be interpreted as written. *Ibid.* If the policy is ambiguous, the policy will be construed in favor of the insured. *Doto v. Russo,* 140 *N.J.* 544, 556, 659 *A.*2d 1371, 1376 (1995). Because of the complex terminology used in the policy and because the policy is in most cases prepared by the insurance company experts, we recognize that an insurance policy is a "contract[ ] of adhesion between parties who are not equally situated." *Id.* at 555, 659 *A.*2d at 1376 (quoting *Meier v. New Jersey Life Ins. Co.,* 101 *N.J.* 597, 611, 503 *A.*2d 862, 869 (1986)). As a result, "courts must assume a particularly vigilant role in ensuring their conformity to public policy and principles of fairness." *Voorhees v. Preferred Mut. Ins. Co.,* 128 *N.J.* 165, 175, 607 *A.*2d 1255, 1260 (1992). "Consistent with that principle, courts also [ ] endeavor [ ] to interpret insurance contracts to accord with the objectively reasonable expectations of the insured." *Doto, supra,* 140 *N.J.* at 556, 659 *A.*2d at 1376–77. As we explained in *Doto, supra,*

[t]he insured's 'reasonable expectations in the transaction may not justly be frustrated and courts have properly molded their governing interpretative principles with that uppermost in mind.' *Allen v. Metropolitan Life Ins. Co.*, 44 *N.J.* 294, 305, 208 *A.2d* 638[, 644] (1965). Moreover, we have recognized the importance of construing contracts of insurance to reflect the reasonable expectations of the insured in the face of ambiguous language and phrasing, *see State, Dep't of Envtl. Protection v. Signo Trading Int'l*, 130 *N.J.* 51, 62, 612 *A.2d* 932[, 938] (1992), and in exceptional circumstances, when the literal meaning of the policy is plain. *See Werner Indus. v. First State Ins. Co.*, 112 *N.J.* 30, 35–36, 548 *A.2d* 188[, 191] (1988) ('At times, even an unambiguous contract has been interpreted contrary to its plain meaning so as to fulfill the reasonable expectations of the insured. . . .'); *Sparks v. St. Paul Ins. Co.*, 100 *N.J.* 325, 338, 495 *A.2d* 406[, 414] (1985); *Gerhardt v. Continental Ins. Cos.*, 48 *N.J.* 291, 297–99, 225 *A.2d* 328[, 332–33] (1966). [*Id.* at 556–57, 659 *A.2d* at 1377.]

We have applied the reasonable expectations doctrine to all forms of insurance contracts. *President, supra,* 180 *N.J.* at 563, 853 *A.2d* at 254.

 Important to our analysis is the principle that exclusions in the insurance policy should be narrowly construed. *Princeton Ins. Co. v. Chunmuang,* 151 *N.J.* 80, 95, 698 *A.2d* 9, 16 (1997). Nevertheless, if the exclusion is " 'specific, plain, clear, prominent, and not contrary to public policy,' " it will be enforced as written. *Ibid.,* 698 *A.2d* at 17 (quoting *Doto, supra,* 140 *N.J.* at 559, 659 *A.2d* at 1378).

## V.

We turn now to apply those principles to the case at hand. Our effort to resolve the competing contentions of the parties concerning the interpretation of the pollution exclusion clause is informed by our case law and by the decisions of other courts that have addressed a similar issue.

## A.

The case of *Morton International, Inc. v. General Accident Insurance Co. of America,* 134 *N.J.* 1, 629 *A.2d* 831 (1993), is instructive. In *Morton,* we evaluated claims of coverage for environmental pollution under a CGL insurance policy during the period of 1961 to 1976. *Id.* at 7, 629 *A.2d* at 834. We reviewed the

events leading up to the insurance industry's adoption of the pollution exclusion, noting that those events "are well-documented and relatively uncontroverted." *Id.* at 31, 629 *A.*2d at 848. We indicated that prior to 1966, CGL policies provided "coverage for bodily injury and property damage 'caused by accident.' " *Ibid.*, 629 *A.*2d at 849 Although the term accident was not defined in the policy, courts generally interpreted the word accident broadly so long as the "injury was unexpected and unintended from the insured's standpoint." *Ibid.* As a result, the insurance industry in 1966 revised its standard-form CGL policy to afford coverage based on an occurrence instead of an accident. *Id.* at 32, 629 *A.*2d at 849. An occurrence was defined as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage that was neither expected nor intended from the standpoint of the insured." *Ibid.* (citations and quotations omitted).

Because that policy change did not limit the insurance companies' exposure to environmentally related losses, in 1970, the insurance industry began "the process of drafting and securing regulatory approval for the standard pollution-exclusion clause." *Id.* at 33, 629 *A.*2d at 850. We recognized then that "[c]ommentators [had] attribute[d] the insurance industry's increased concern about pollution claims to environmental catastrophes that occurred during the 1960's." *Ibid.* The result of those efforts was the standard pollution-exclusion clause, known as exclusion "f," *id.* at 34, 629 *A.*2d at 850, that provided in part:

> This insurance does not apply * * * (f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is *sudden and accidental.*
>
> [*Id.* at 11, 629 *A.*2d at 836 (emphasis added).]

The next round of litigation concerned the meaning of the words "sudden and accidental." *Id.* at 44–69, 629 *A.*2d at 856–70. We reasoned that the conflict over whether sudden means abrupt or

unexpected was not really the issue; rather the crucial inquiry was

> whether the courts of this state should give effect to the literal meaning of an exclusionary clause that materially and dramatically reduces the coverage previously available for property damage caused by pollution, under circumstances in which the approval of the exclusionary clause by state regulatory authorities was induced by the insurance industry's representation that the clause merely 'clarified' the scope of the prior coverage.
>
> [*Id.* at 72, 629 A.2d at 872.]

We concluded, applying the doctrine of reasonable expectations, that the common understanding of state regulators was that the "overriding purpose [of the pollution clause] was to deny coverage to intentional polluters." *Id.* at 77, 629 A.2d at 875. We imputed the reasonable expectations of the New Jersey insurance regulatory authority to insureds and interpreted the pollution exclusion "to provide coverage identical with that provided under the prior occurrence-based policy[.]" *Id.* at 78, 629 A.2d at 875. In light of the insurance industry's failure to disclose the "intended effect of this significant exclusionary clause," while at the same time "profit[ing] from that nondisclosure by maintaining pre-existing rates for substantially-reduced coverage," we concluded that it was fair for the industry to "be required to bear the burden of its omission by providing coverage at a level consistent with its representations to regulatory authorities." *Id.* at 79–80, 629 A.2d at 876.

## B.

Before *Morton* was decided, in response to much of the litigation surrounding the "sudden and accidental" pollution exclusion for environmentally-related losses, the insurance industry proposed a new pollution exclusion, first appearing in 1985, and commonly known as the absolute exclusion clause. That exclusion is much like the exclusion in the Selective policy in the present case. Two of the obvious differences in the proposed absolute exclusion were the elimination of the reference to an "exception for the 'sudden and accidental' release of pollution, and [ ] the elimination of the requirement that the pollution be discharged 'into or upon land, the atmosphere or any watercourse or body of

water.'" *Am. States Ins. Co. v. Koloms,* 177 *Ill.*2d 473, 227 *Ill.Dec.* 149, 687 *N.E.*2d 72, 81 (1997) (citations omitted).

The insurance industry presented testimony to the insurance regulators as to the intended purposes of the absolute pollution exclusion. One commentator reviewed the transcripts of the hearings before the New Jersey insurance regulators and stated:

In 1985, for example, the New Jersey State Insurance Department held hearings to determine whether to approve what became the 1986 exclusion. In those hearings, the New Jersey insurance commissioners heard testimony from various members of the insurance industry regarding the [absolute pollution exclusion]. The regulators were concerned that the then-proposed exclusion sought to sweep too many potential non-environmental liabilities within its reach. The insurance industry sought to allay those fears and, thus, secure the needed approval of this exclusion. Michael A. Averill, a manager of the Insurance Services Office, Inc. ("ISO"), an insurance industry trade organization, Commercial Casualty Division, stated that the insurance industry did not intend to use the revised pollution exclusion as a bar to coverage: '[The purpose of the change in policy language] is to introduce a complete on-site emission and partial off-site exclusion for some operations. *For some operations. It is not an absolute exclusion.*' [ ]

Another speaker, Robert J. Sullivan, Vice President of Government Affairs for Crum & Forster in Morristown, New Jersey, testified that the exclusion would not preclude coverage for liability for a policyholder's products and completed operations.

[Lorelie S. Masters, *Absolutely Not Total: State Courts Recognize the Historical Limits of the "Absolute" and "Total" Pollution Exclusions,* Envtl. Claims J. Vol. 15, No. 4, 453–54 (Autumn 2003) (emphasis in the original); see also *Kimber Petrol. Corp. v. Travelers Indem. Co.,* 298 N.J.Super. 286, 298, 689 A.2d 747, 753–54 (App.Div.1997)(noting evidence presented by insurance industry to Department of Insurance supporting absolute pollution exclusion clause).]

Additionally, commentators have explained that the absolute pollution exclusion was developed to address the expansion of liability for remediating hazardous waste imposed under the Comprehensive Environmental Response, Compensation & Liability Act (CERCLA, 42 *U.S.C.* § et. seq.) in 1980. *Masters, supra,* Envtl. Claims. J. at 457; Jeffrey W. Stempel, *Reason and Pollution: Correctly Construing the "Absolute" Exclusion In Context and in Accord with Its Purpose and Party Expectations,* 34 Tort & Ins. L.J. 1, 29–32 (1998) ("[T]he available evidence most strongly suggests that the absolute pollution exclusion was designed to serve the twin purposes of eliminating coverage for gradual envi-

ronmental degradation and government-mandated cleanup such as Superfund response cost reimbursement.").

## C.

We have reviewed the development of the pollution exclusion to assist our interpretation of the pollution exclusion in the Selective policy. Based on that review, we are confident that the history of the pollution-exclusion clause in its various forms demonstrates that its purpose was to have a broad exclusion for traditional environmentally related damages. *See Koloms, supra,* 227 *Ill.Dec.* 149, 687 *N.E.*2d at 81 (finding history shows predominant motivation behind pollution exclusion was avoidance of "enormous expense and exposure resulting from the 'explosion' of environmental litigation[ ]") (quotations omitted).

Notably, we have not been presented with any compelling evidence that the pollution exclusion clause in the present case, when approved by the Department of Insurance, was intended to be read as broadly as Selective urges. *See Stempel, supra,* 34 *Tort & Ins. L.J.* at 33. ("If the absolute exclusion was intended to reach as broadly as now contended, one would expect to see conclusive ISO memoranda and similar documents"). To be sure, read literally, the exclusion would require its application to all instances of injury or damage to persons or property caused by "any pollutants arising out of the discharge, dispersal, seepage, migration, release or escape of . . . any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." If we were to accept Selective's interpretation of its pollution exclusion, we would exclude essentially all pollution hazards except those falling within the limited "exception" for exposure within a structure resulting from a release of pollutants "within a single forty-eight hour period." We reject Selective's interpretation as overly broad, unfair, and contrary to the objectively reasonable expectations of the New Jersey and other state regulatory authorities that were

presented with an opportunity to disapprove the clause. *Morton supra,* 134 *N.J.* at 30, 629 *A.*2d at 848.

Our conclusion in *Morton* is equally applicable here.

Rather than 'clarify' the scope of coverage the clause virtually eliminated pollution-caused property-damage coverage, without any suggestion by the industry that the change in coverage was so sweeping or that rates should be reduced. For those reasons, we decline to enforce the [ ] pollution-exclusion clause as written. To do so would contravene this State's public policy requiring regulatory approval of standard industry-wide policy forms to assure fairness in rates and in policy content, and would condone the industry's misrepresentation to regulators in New Jersey and other states concerning the effect of the clause.

[*Ibid.*]

The touchstone of our decision in *Morton* was that the insurance industry may not seek approval of a clause restricting coverage for the asserted reason of avoiding catastrophic environmental pollution claims and then use that same clause to exclude coverage for claims that a reasonable policyholder would believe were covered by the insurance policy. Moreover, our conclusion that the scope of the pollution exclusion should be limited to injury or property damage arising from activity commonly thought of as traditional environmental pollution is consistent with the choice of the policy terms, "discharge, dispersal, release or escape" in Selective's policy. As one court observed: "The drafters' utilization of environmental law terms of art ('discharge,' 'dispersal,' . . . 'release' or 'escape' of pollutants) reflects the exclusion's historical objective-avoidance of liability for environmental catastrophe related to intentional industrial pollution." *Motorists Mut. Ins. Co. v. RSJ, Inc.,* 926 *S.W.*2d 679, 681 (Ky.Ct.App.1996).

### D.

The decisions of the highest courts in California, Illinois, Massachusetts, Ohio, New York and Washington are consistent with our decision to limit the pollution exclusion to those hazards traditionally associated with environmentally related claims. In *MacKinnon v. Truck Insurance Exchange,* 31 *Cal.*4th 635, 3 *Cal. Rptr.*3d 228, 73 *P.*3d 1205 (2003), the California Supreme Court considered the application of an absolute pollution exclusion clause

where the owner of a building negligently sprayed pesticides causing injury to a tenant in the building. The court considered the history and purpose of the absolute exclusion clause and held it should be limited to "injuries arising from events commonly thought as pollution, i.e. environmental pollution[.]" *Id.* at 1216.

Similarly, the Illinois Supreme Court examined the scope of the absolute pollution exclusion where several persons filed suit after inhaling carbon monoxide from a defective furnace in a two-story commercial building. *Koloms, supra,* 177 *Ill.*2d 473, 227 *Ill.Dec.* 149, 687 *N.E.*2d 72. The court held that based on the historical background of the absolute pollution exclusion and the use of environmental terms, "the exclusion applies only to those injuries caused by traditional environmental pollution" and that did not include the release of carbon monoxide from a broken furnace. *Id.* at 82. In two other carbon monoxide cases, the Supreme Courts of Massachusetts and Ohio also concluded that the pollution clause would not bar coverage. *W. Alliance Ins. Co. v. Gill,* 426 *Mass.* 115, 686 *N.E.*2d 997 (1997); *Andersen v. Highland House Co.,* 93 *Ohio St.*3d 547, 757 *N.E.*2d 329 (2001).

In *Belt Painting Corp. v. TIG Insurance Co.,* 100 *N.Y.*2d 377, 763 *N.Y.S.*2d 790, 795 *N.E.*2d 15 (2003), the highest court in New York was asked to decide whether there was coverage for a contractor for injuries caused by the release of paint or paint solvent fumes. After noting that in a prior decision the court recognized that the "purpose of the exclusion was to deal with broadly dispersed environmental pollution," the court ordered the insurer to provide coverage. *Id.* at 18. The court found that if it were to adopt the insurer's definition of pollutants as "any solid, liquid, gaseous or thermal irritant or contaminant including ... fumes," then any "'chemical' or indeed, any 'material to be recycled,' that could 'irritate' person or property would be a 'pollutant.'" *Id.* at 20. The court expressly declined "to adopt an interpretation that would infinitely enlarge the scope of the term 'pollutants', and seemingly contradict both a 'common [sense]'

understanding of the relevant terms and the reasonable expectations of a businessperson." *Ibid.*

Lastly, in *Kent Farms v. Zurich Insurance Co.*, 140 *Wash.*2d 396, 998 *P.*2d 292 (2000), a man was injured when a faulty valve in a fuel tank caused a leak. The Supreme Court of Washington held that the absolute pollution exclusion was not a bar to coverage. The court analyzed the history of the various forms of the pollution exclusion clauses and found the "insurance companies' objective in creating [such] clauses was to avoid liability for environmental pollution. To read the absolute exclusion clause more broadly ignores the general coverage provisions." *Id.* at 295. The court explained that its approach was "consonant ... with the provisions of the insurance policy as a whole; that is, the pollution exclusion clause was designed to exclude coverage for traditional environmental harms." *Id.* at 296.

E.

We recognize that the decisions of our Appellate Division can be read as in conflict. *See Golden Estates, supra*, 293 *N.J.Super.* at 402, 680 *A.*2d 1114 (noting "absolute pollution exclusion was intended to apply only to environmental claims, and not to claims of personal injury or property damage which can be separated from the substance's environmental toxicity"); *Byrd, supra*, 317 *N.J.Super.* at 504, 722 *A.*2d 598 (noting absolute pollution exclusions should be analyzed on case-by-case basis and are "ambiguous in the absence of specific language excluding from coverage injury or damage caused by the indoor residential exposure to lead paint"); *Leo Haus, supra*, 353 *N.J.Super.* at 67, 801 *A.*2d 419 (holding absolute pollution exclusion not limited to traditional environment pollution and applicable to include injury from carbon monoxide emanating from defective heating unit). Because we conclude that the pollution exclusion clause as presently approved should be limited to traditional environmental pollution, we disapprove of any contrary view expressed in our case law.

## VI.

We find no need to address the ramifications of the 48–hour exception and whether it should be read to expand the pollution exclusion clause. We interpret that exception to limit the reach of the pollution clause, i.e. if the environmental pollution occurs within a building within a single forty-eight hour period, and the other conditions are met, then the insured may receive coverage for that environmental pollution claim. Simply put, if the pollution exclusion is not applicable, neither is the exception to the pollution exclusion.

## VII.

As a final observation, the insurance industry has revised its policies in the past to provide for the exclusion of certain coverages. We will review each change on the record presented. We emphasize that industry-wide determinations to restrict coverage of risks, particularly those that affect the public interest, such as the risk of damage from pollution, environmental or otherwise, must be fully and unambiguously disclosed to regulators and the public.

## VIII.

The judgment of the Appellate Division is reversed. We remand to the trial court for further proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice PORITZ and Justice LONG, LaVECCHIA, ZAZZALI, ALBIN and WALLACE—6.

*Opposed*—None.