**Larry HEADLEY and Helen Headley, Plaintiffs,**

v.

**ST. PAUL FIRE AND MARINE INSURANCE COMPANY, and Continental Western Insurance Company, and Union Insurance Company, Defendants.**

**No. CIV 87–5124.**

United States District Court, D. South Dakota, W.D.

Jan. 19, 1989.

Gene N. Lebrun, Rapid City, S.D., for plaintiffs.

J. Crisman Palmer, Rapid City, S.D., for St. Paul Fire & Marine.

Dennis Hill & William A. May, Rapid City, S.D., for Union Ins. Co.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BOGUE, Senior District Judge.

The above-entitled case is a declaratory judgment action which was presented to the Court on November 28–29, 1988. Plaintiffs appeared in person and by their attorney, Gene N. Lebrun. Involuntary Plaintiff, Midland Heights Water & Service Company, Inc., did not make an appearance. Defendant St. Paul Fire and Marine Insurance Company appeared through its attorney, J. Crisman Palmer. Defendant Union Insurance Company appeared through its attorneys, Dennis H. Hill and William A. May. Defendant Continental Western Insurance Company settled with the Plaintiffs and did not appear.

## FINDINGS OF FACT

### I.

Midland Heights Water & Service Company [hereinafter Midland] incorporated on April 7, 1976 to primarily provide water and sewer services to a residential subdivision known as Midland Heights, located in Meade County, South Dakota.

### II.

The sewage disposal facility used to service part of the subdivision, known as a NoDak system, was similar to the systems first developed in the 1950's in North Dakota for use on flat, relatively impermeable soils. Liquids discharged into a NoDak system are lost through percolation, evaporation, and transpiration. NoDak systems can handle larger volumes of liquid wastes when the weather is hot, plant growth on top of the system is vigorous, humidity is low, and winds are present in order to facilitate evaporation and transpiration of liquids discharged into the unit. The level of waste water in the NoDak system can be expected to rise or even overflow during spring runoff, during periods of cloudy, wet weather or during the winter.

### III.

The NoDak system at Midland Heights was first built in 1976 and was acquired by Midland in 1977. It serves as a central seepage disposal system for 29 homes in the subdivision. The Headleys' home is not connected to the NoDak system, because it is served by its own septic field. The natural land contours and drainage away from the NoDak is across the rear of the Headleys' residential lot.

### IV.

The corporate directors and officers of Midland became aware of a leakage problem from the side of the NoDak in 1977. This leakage continued to be observed by corporate officials, with varying degrees of discharge, until completion of a bentonite dam around three sides of the NoDak in January of 1981.

### V.

On May 26, 1978 the Headleys purchased their home which is immediately adjacent to the NoDak. At the time of the purchase, the Headleys found no evidence of drainage from the NoDak onto the property they were purchasing.

### VI.

The Headleys filed a complaint with the South Dakota Office of Water Quality of the Department of Water and Natural Resources on August 6, 1980, stating that they first observed drainage from the NoDak onto their property during the late summer of 1979. They also stated in their complaint that the discharge continued to flow from the time they first observed it until the time they filed their complaint.

### VII.

An investigation conducted in response to Headleys' complaint disclosed that the NoDak was operating at over capacity. In order to correct the leakage problem, a bentonite dam was installed around three sides of the NoDak in 1981. It was understood by Midland at that time the bentonite dam was not intended to increase the capacity of the NoDak. The dam's main purpose was to solve the leakage problem onto Headleys' property. Midland and the

homeowners were informed that future seepage was possible and that the bentonite repair was not to cure the inherent problems of underdesign and overcapacity usage. The NoDak could be expected to function for a period of time without leakage problems after completion of the bentonite dam, but once the soil became saturated failure could be expected. The process of the system becoming oversaturated was not something which would suddenly happen, but was instead a gradual process.

## VIII.

No leakage was observed from the No-Dak system from the time of completion of the bentonite seal in 1981 until February of 1984, when Larry Headley noticed a pooling of liquid on top of the NoDak system. This pooling was a result of the inability of the system to leak through the side due to the installation of the dam. On several occasions thereafter, the buildup of liquid effluent on top of the NoDak system was so great that it would overflow its boundaries and gradually flow across the Headley property. These overflows continued through 1984, 1985 and until September of 1986, when an alternative leach field was added to the NoDak system to increase its capacity. Since the completion of the leach field (with three exceptions when the system was not operating properly) there have been no further flows of effluent across the Headley property from the NoDak system.

## IX.

Once the overflow of the effluent from the NoDak system reappeared in February of 1984, after the construction of the bentonite dam, continued releases of effluent from the system were expected from the standpoint of Midland, as Midland knew that the problem of overflowing could not be corrected until the capacity of the system was increased.

## X.

Prior to February 21, 1980 Midland was not covered by any insurance liability policy. From February 21, 1980 until February 21, 1985, Midland was insured under policies of comprehensive general liability insurance issued by the St. Paul Fire and Marine Insurance Company. Midland was uninsured from February 21, 1985 until July 11, 1985. From July 11, 1985 until July 11, 1986, Midland was insured under a policy of comprehensive general liability insurance issued by the Union Insurance Company. From July 11, 1986 through July 11, 1987, Midland was insured by a policy of comprehensive general liability insurance issued by the Continental Western Insurance Company.

## XI.

Midland tendered the Headleys' complaint to its insurers for defense and indemnification. Each insurer denied any duty to defend or indemnify Midland against the complaint, asserting that the various policies were unambiguous and excluded coverage for Headleys' claims.

## XII.

The St. Paul policies issued to Midland provided that St. Paul would pay on behalf of Midland all sums which Midland was legally obligated to pay as damages arising out of bodily injury or property damage, provided that the bodily injury or property damage happened during St. Paul's policy periods. The policies further provided that the bodily injury or property damage must be caused by an occurrence, meaning an accident, including continuous or repeated exposure to conditions, neither expected nor intended from the standpoint of Midland. Coverage provided by St. Paul were further subject to an exclusion from coverage for bodily injury or property damage arising from the discharge, dispersal, release, or escape of pollutants, unless such discharge, dispersal, release or escape was sudden and accidental. The St. Paul policies also provided that St. Paul would defend any suit commenced against Midland alleging such covered bodily or property damage.

## XIII.

Defendant Union issued a comprehensive general liability policy to Midland effective

from July 11, 1985 to July 11, 1986. The policy provided coverage, *inter alia,* for bodily injury and property damage. The policy further provided that the bodily injury or property damage must occur as an accident, including continuous or repeated exposure to the harm, which was neither expected nor intended from the standpoint of Midland. The policy also contained a specific exclusion to bodily injury or property damage arising out of the discharge, dispersal, release or escape of pollutants, unless such discharge, dispersal, release or escape was sudden or accidental. The Union policy also provided that Union would defend any suit commenced against Midland alleging such covered bodily injury or property damage.

## XIV.

On August 26, 1986, Larry Headley and Helen Headley commenced an action in state circuit court against Midland alleging damages for: (1) deprivation of the reasonable and free use and enjoyment of their property; (2) diminution in the value of their property; (3) punitive damages for failure to prevent the flow of effluent onto their property, which failure was alleged to be a willful, wanton, knowing, continuous and conscious indifference to their rights; and (4) injunctive relief pursuant to S.D.C.L. 34A–10.

## XV.

In November of 1987, Headleys commenced a declaratory judgment action seeking this Court's determination of the scope of the various insurance policies purchased by Midland to provide general comprehensive liability coverage.

## CONCLUSIONS OF LAW

### I.

This Court has diversity jurisdiction over the parties under 28 U.S.C. § 1332 and by virtue of the amount in controversy. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 2201 to declare the rights and other legal relations between the parties in this case.

### II.

■ The Headleys' claims against Midland for property damage, consisting of the deprivation of their free use and enjoyment of their property, and the diminution in value of their property, are not covered under any policy of insurance issued by St. Paul to Midland.

### III.

The Headleys first became aware of the effluent discharge across their residential lot in late summer of 1979. This occurrence of property damage was prior to the effective dates of the St. Paul policies.

### IV.

The Headleys' claim of property damage constitutes but one occurrence of property damage. Because Midland became aware of the leakage from the NoDak in 1977, which was prior to the time the Headleys even owned or occupied their land, and because Midland elected to continue its operations with knowledge that such leakage would continue to occur, all subsequent discharges of effluent were no longer sudden and accidental from the viewpoint of Midland. Once the discharge from the NoDak caused property damage to the Headleys, all subsequent flows causing damage are but varying degrees of the original discharge.

### V.

The St. Paul policies are simple and straightforward: occurrences arising out of the discharge, dispersal, release, or escape of pollutants are not covered under the policy unless the occurrence was sudden and accidental, as from the viewpoint of the insured. From the viewpoint of Midland, the property damage which did happen occurred gradually and over an extended period of time which was anticipated and predictable. Therefore, even though there would be periods of abatement from the effluent discharge, subsequent flows were expected and predictable by Midland. As a result, the varying dis-

charges on the Headleys' property were neither sudden or accidental, even though the degree for exact times of such discharges could not be empirically predetermined. It was all a part of a continuous flow originating in 1977.

### VI.

■ The test in determining what is a sudden accident was discussed in *Benedictine Sisters v. St. Paul Fire and Marine Ins.*, 815 F.2d 1209, 1211 (8th Cir.1987). The court held that the test of whether or not an insured expected or intended the harm at the time it occurred is determined by inquiring whether the insured knowingly created and permitted the harm to exist. Midland, as successor in ownership of the NoDak, knew that there were inherent problems of underdesign and overuse of the system at the time they became owners. This knowledge became solidified as fact when Midland first recognized the leakage from the NoDak in 1977. Once this fact became recognized they then permitted the immediate harm and the potential future harm to exist without taking proper steps to implement corrective measures until forced to do so by the State.

### VII.

During the construction and after the completion of the bentonite dam around three sides of the NoDak in January of 1981, Midland possessed sufficient knowledge that the bentonite seal was not intended to correct the inherent problems of underdesign and overuse, but was merely intended to temporarily abate the discharge of effluent onto Headleys' property. Midland possessed further knowledge that the discharge from the NoDak prior to the construction of the bentonite dam was likely to reoccur in the future unless corrective measures were taken to resolve the system's inherent problems.

### VIII.

Resurfacing of effluent on top of the NoDak did occur in February of 1984. Because Midland knew that the system's inherent problems continued to exist after completion of the bentonite dam, any reoccurrence of effluent discharge was expected and intended. When such discharge did in fact occur, it was neither sudden or accidental and was part of the continuous harm originating in 1977.

### IX.

■ The Headleys' claim against Midland for injunctive relief pursuant to SDCL 34A–10 is not covered under any policy of insurance issued to Midland by St. Paul. St. Paul is not obligated to defend Midland against any such claim, as it is not for a sum of money which Midland may be obligated to pay under the terms of the policy's coverage.

### X.

The escape of effluent onto Headleys' property during the effective dates of Union Insurance Company's coverage of Midland was not sudden or accidental, from the viewpoint of Midland. The conclusions of law as stated herein as to St. Paul are also applicable to Union. Therefore, because the varying degrees of effluent discharge onto Headleys' property were part of a continuous harm originating in 1977, and because such harm occurred prior to the effective coverage of Union's insurance agreement, Union is not obligated in any manner as to the issues of this case.