Becky BAUGHMAN, et al., Plaintiffs,

v.

UNITED STATES LIABILITY
INSURANCE COMPANY,
Defendant.

Civil No. 08–2901 (JBS/KW).

United States District Court,
D. New Jersey.

Nov. 13, 2009.

Scott B. Gorman, Esq., Gorman & Gorman, Esqs., Cherry Hill, NJ, for Plaintiffs Becky Baughman, Steven Baughman, and Kiddie Kollege Daycare & Preschool, Inc.

Lila Wynne, Esq., Marshall, Dennehey, Warner, Coleman & Goggin, PC, Cherry Hill, NJ, for Defendant United States Liability Insurance Company.

## OPINION

SIMANDLE, District Judge:

The Court is asked to resolve a dispute regarding insurance coverage for several underlying state court actions arising out of alleged mercury contamination of a daycare center owned, until recently, by Plaintiffs Becky Baughman and Steven Baughman. Defendant United States Liability Insurance Company has declined to defend or indemnify Plaintiffs in the underlying actions despite their comprehensive general liability ("CGL") policy. Presently before the Court are Plaintiffs' motion for partial summary judgment [Docket Item 10] and Defendant's cross-motion for summary judgment [Docket Item 13]. The central issues to be decided are whether the underlying state court actions seek "damages" for "bodily injury" within the meaning of the CGL and whether coverage for those actions falls within the absolute pollution exclusion of the CGL. For the reasons set forth below, the Court will grant summary judgment in favor of Plaintiffs on their claims for declaratory judgment and breach of contract, but grant summary judgment in favor of Defendant on Plaintiffs' claims of breach of implied duty of good faith and fair dealing, common law fraud, and violations of the New Jersey Consumer Fraud Act.

## I. BACKGROUND

Becky and Stephen Baughman are a husband and wife who moved from Texas to Gloucester County, New Jersey in 2000. (Becky Baughman Certification ¶¶ 1, 3, 18.) On December 9, 2005, the Baughmans purchased an existing daycare center, Kiddie Kollege Daycare & Preschool, Inc. ("Kiddie Kollege") from Matthew Lawlor and Julie Lawlor. (Id. ¶ 4.) The Baughmans were acquainted with Kiddie Kollege because their children attended the daycare center. (Id. ¶ 5.) The Baughmans similarly purchased a commercial package insurance policy which included comprehensive general liability coverage. (Becky Baughman Certification ¶ 6, Exh. A.) Becky Baughman is the sole named insured on the CGL policy. (Becky Baughman Certification, Ex. A.) The inception date of that policy was December 9, 2005. (Becky Baughman Certification ¶ 6.)

From December, 2005 through July 28, 2006, the Baughmans owned and operated Kiddie Kollege, where Stephen Baughman

was an employee. (Stephen Baughman Certification, Exh. A.) On July 28, 2006, the New Jersey Department of Environmental Protection ("NJDEP") informed Becky Baughman that the daycare center building was uninhabitable due to mercury contamination. (Becky Baughman Certification ¶ 10.) On that same day the Baughmans closed the daycare center. (*Id.* ¶ 9.) It is undisputed that the alleged mercury contamination is due to the business operations of Accutherm, Inc., a thermometer manufacturing company that operated in the building approximately twenty years before the Baughmans purchased Kiddie Kollege.

Beginning in October, 2006, five lawsuits were commenced on behalf of children who attended Kiddie Kollege and persons who worked for the daycare center naming the Baughmans, among others, as defendants. (Gorman Certification Exhs. A–E.) Those actions, all brought in Gloucester County Superior Court, are: *Mignano v. Jim Sullivan, Inc.,* Docket No. GLO–L–1309–06; *Conti v. Jim Sullivan, Inc.,* Docket No. L–1617–06; *Kahana v. Accutherm, Inc.,* Docket No. L–1823–06; *Foster v. Jim Sullivan, Inc.,* Docket No. L–280–07; and *Allonardo v. Jim Sullivan, Inc.,* Docket No. L–406–08. (*Id.*) The *Conti* and *Foster* actions have since been voluntarily dismissed. (Gorman Certification ¶ 10.) The Baughmans properly notified Defendant of each of the underlying lawsuits and Defendant disclaimed coverage for each of those actions.[1] (Gorman Certification ¶¶ 28–31; Becky Baughman Certification ¶¶ 12–15.) Thus, the Baughmans have been forced to provide for their own defense. (Becky Baughman ¶ 16.)

## A. Underlying Lawsuits

The underlying lawsuits at issue were brought against not only the Baughmans, but Accutherm, Jim Sullivan, Inc. (the property owner), the Lawlors, the NJDEP, Gloucester County, and Franklin Township. The facts alleged in all three underlying lawsuits are similar and they tell a similar story. According to those complaints, the building at 162 Station Avenue, Franklinville, New Jersey (the location of Kiddie Kollege) has been contaminated with mercury since occupied by Accutherm, Inc., a thermometer manufacturer, from June, 1984 until at least June, 1990. (*Mignano* Complaint ¶¶ 22, 33–34; *Conti* Complaint ¶ 6; *Kahana* Complaint ¶¶ 39–50.) Despite directives from the NJDEP, Accutherm did not clean up the site. (*Mignano* Complaint ¶¶ 54–56; *Conti* Complaint ¶ 6; *Kahana* Complaint ¶¶ 25–29.)

Over the years, various governmental and private parties performed testing and warned of mercury contamination in the building. As early as 1987, the New Jersey Department of Health noted the "mercury exposure problem" at the Accutherm building. (*Kahana* Complaint ¶ 55.) In 1994, National Midlantic Bank, the mortgage holder for the site, commissioned a report by Environmental Waste Management Associates, which warned Accutherm, "Any person entering the building should be equipped in level C personal protection equipment" due to toxic levels of mercury vapor. (*Mignano* Complaint ¶¶ 41–46; *Kahana* Complaint ¶¶ 80–82.) In 1995, the Gloucester County Department of Health instructed Accutherm:

---

1. Plaintiffs have voluntarily dismissed all claims related to the *Foster* matter. Further, it appears that as of May 5, 2009, Plaintiffs had not yet been served with the complaint in *Allonardo* and so have not yet been required to defend in that action, making their request for coverage in that action premature. (Wynne May 7, 2009 Certification.) The Court will consequently discuss only the three remaining underlying suits.

The best method of control would remain to clean up the facility of any remaining mercury and after a thorough decontamination, recheck vapor levels. I would suggest that there be restriction of personnel entering the building to only those properly trained and equipped.

(*Mignano* Complaint ¶ 58; *Kahana* Complaint ¶ 94.) The United States Environmental Protection Agency reported in 1995

Based on air monitoring results, the potential for exposure to Hg vapor outside the building does not exist. Soil sampling date indicates that though Hg is present in two samples . . . the site does not present an immediate threat to health or the environment.

(*Kahana* Complaint ¶ 98.) In June, 1996, the NJDEP added the site to its list of "Known Contaminated Sites in New Jersey," on which it remained until at least 2004. (*Mignano* Complaint ¶¶ 63–64, 74–75, 104.)

Despite these warnings, Franklin Township, Gloucester County, and the State of New Jersey permitted Jim Sullivan to purchase the unremediated property and convert it to a daycare center, despite alleged actual knowledge by all participants that the site was contaminated. (*Mignano* Complaint ¶¶ 33–103; *Kahana* Complaint ¶¶ 51–124.) As of June, 2006, Sullivan had not performed any indoor testing. (*Kahana* Complaint ¶ 154.) On July 28, 2009, NJDEP received "preliminary results of indoor mercury testing, revealing widespread mercury vapor exceeding acceptable environmental standards for human exposure, as well as elemental mercury on indoor surfaces also exceeding acceptable standards for human exposure." (*Kahana* Complaint ¶ 156.)

### 1. Allegations and Claims Regarding the Baughmans

The specific allegations regarding Plaintiffs, however, are sparse in each of the complaints. The *Mignano* Complaint alleges only

The remaining defendants, Kiddie Kollege Daycare & Preschool, Inc., Stephen and Becky Baughman, and Julie and Matthew Lawlor, failed to make reasonable inquiry as to the nature of the site, which, *inter alia*, was listed as a contaminated site by NJ DEP in several lists and publications from 1997 until at least 2004.

(*Mignano* Complaint ¶ 104.) It brings claims of strict liability, public nuisance, negligence, and battery against the Baughmans. (*Id.* ¶¶ 136–66.)

The *Conti* Complaint has only this to say about the Baughmans: "Upon information and belief, Defendant[s] Stephen and Becky Baughman are the owners and operators of Kiddie Kollege Day Care and Preschool." (*Conti* Complaint ¶ 8.) It brings claims of battery, strict liability, and negligence against all defendants. (*Id.* ¶¶ 17–35.)

The *Kahana* Complaint has two references to the Baughmans, one identifying them as "the current beneficial owners" of Kiddie Kollege at the time of its closure, (*Kahana* Complaint ¶ 36), and observing that on July 28, 2008, the NJDEP notified the Baughmans, along with Sullivan and Franklin Township, "that the building should not be inhabited until further notice," (*id.* ¶ 157). The *Kahana* class bring claims of strict liability, negligence, nuisance, battery, and public nuisance against the Baughmans. (*Id.* ¶¶ 191–215, 219–25.)

### 2. Harm and Relief Requested

The harm and alleged in the underlying complaints varies only a little. The *Mignano* Complaint, a proposed class action, begins by noting the "dangers of mercury exposure" including permanent damage to various organs, (*Mignano* Complaint ¶ 3),

"increased risk of invisible genetic injury and/or an enhanced susceptibility to cancer," (*id.* ¶ 119). The named infant plaintiff, however, "has no current symptoms of any bodily injury." (*Id.* ¶ 114.) The *Mignano* plaintiffs seek court-administered medical surveillance "with defendants being ordered to pay the costs associated with such a program," a constructive trust of monies defendants (including the Baughmans) received under the New Jersey Spill Compensation Fund, along with other forms of declaratory and injunctive relief and "judgment in favor of each class member for the injuries suffered as a result of the conduct alleged herein." (*Id.* Prayer for Relief.)

The *Conti* Complaint alleges that Jacob Conti, age four, "was exposed to mercury" which "is known to be a dangerous substance and can cause severe harm to young children," so that the *Conti* plaintiffs "have and will continue to be injured, damaged and otherwise harmed" due to exposure to mercury. (*Conti* Complaint ¶¶ 12–14.) The *Conti* plaintiffs request "injunctive relief" in the form of court-supervised medical surveillance, declaratory relief, and compensatory damages. (*Id.* ¶¶ 15–35)

The *Kahana* Complaint, another class action, notes the "increased risk of severe health and developmental affects" due to exposure to mercury, with symptoms that "develop insidiously over a period of years." (*Kahana* Complaint, ¶¶ 6, 8–11.) The children of the named plaintiffs' "feet peeled and they both constantly seemed tired," while one child grew slowly, was thin, and had no appetite. (*Id.* ¶ 136.) The *Kahana* class seeks monetary damages, medical monitoring, and other equitable relief to address the public nuisance. (*Id.* ¶¶ 191–225.)

## B. CGL Policy

The CGL policy states its coverage, in relevant part, as follows

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured again any "suit" seeking those damages ...

(Becky Baughman Certification, Exh. A, CGL Policy at 1.) "Bodily injury" is defined as (a) bodily injury, (b) sickness, (c) disease, or (d) mental anguish or emotional distress arising about of a, b, or c, "sustained by a person, including death resulting from any of these at any time." (*Id.*, Expanded Definition of Bodily Injury.) "Damages" is not defined.

The absolute pollution exclusion reads as follows

> f. Pollution, Organic Pathogen, Silica, Asbestos and Lead
>
> 1. "Bodily injury" or "property damage"; or
>
> . . .
>
> 3. Loss, cost or expense, including but not limited to payment for investigation or defense, fines and penalties, arising out of any governmental or any private party action, that an insured or any other party test for, monitor, clean up, remove, contain, mitigate, treat, detoxify or neutralize or in any way respond to or assess the actual or alleged effects of "pollutants", "organic pathogens", "silica", or lead;
>
> arising directly, indirectly, in concurrence with or in any sequence out of the actual, alleged or threatened presence of or exposure to, ingestion, inhalation, absorption, contact with discharge, dispersal, seepage, release or escape of "pollutants", "organic pathogens", "sili-

ca", asbestos, or lead, whether or not any of the foregoing are (1) sudden, accidental or gradual in nature; (2) intentional; or (3) expected or intended from the standpoint of the insured.

. . .

"Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, toxic materials, "volatile organic compound" and gases therefrom, radon, combustion byproducts and "waste."

. . .

(Becky Baughman Certification, Exh. A, Endorsement L–599.)

### C. Procedural History

In May 2008, Plaintiffs filed a complaint in the Superior Court of New Jersey seeking declaratory judgment declaring that Becky Baughman, Stephen Baughman, and Kiddie Kollege are all insureds under the insurance policy and that Defendant was obligated to defend and indemnify them in the underlying actions, as well as reformation of the insurance policy, and damages for breach of contract, breach of implied duty of good faith and fair dealing, common law fraud, and fraud under the New Jersey Consumer Fraud Act. On June 11, 2008, Defendant removed the action to this Court, asserting diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

Plaintiffs moved for partial summary judgment with regard to their request for declaratory judgment and their breach of contract claim. Defendant responded with a cross-motion for summary judgment on all issues, arguing, *inter alia*, that the underlying suits are not seeking "damages" due to "bodily injury" and so are not covered by the CGL policy, that the absolute pollution exclusion bars coverage, that neither Stephen Baughman nor Kiddie Kollege are insureds under the policy, and

that all other claims fail either as a matter of law or due to an absence of facts. In the motions process, Plaintiffs have voluntarily dismissed (or clarified that they never sought) the following claims: (1) Plaintiffs are no longer seeking coverage for the *Foster* matter; (2) Plaintiffs are no longer seeking coverage for Kiddie Kollege; (3) Plaintiffs do not seek coverage for punitive damages or claims related to property damage; and (4) Plaintiffs have withdrawn the claim for reformation.

## II. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). In deciding whether there is a disputed issue of material fact, the Court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. 2505; *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 329–30 (3d Cir.1995) (citation omitted).

### B. Coverage Disputes

■ The questions presented regarding coverage call upon the Court to interpret the CGL insurance policy under appli-

cable New Jersey law.[2] Generally, when interpreting an insurance policy, "the court should give the words of the policy 'their plain, ordinary meaning.'" *Sahli v. Woodbine Bd. of Educ.*, 193 N.J. 309, 938 A.2d 923, 930 (2008) (quoting *Zacarias v. Allstate Ins. Co.*, 168 N.J. 590, 775 A.2d 1262 (2001)). If the words of the policy are clear, the policy should be interpreted as written. *Id.* If the words of the policy are ambiguous, the policy will be construed in favor of the insured. *Id.* When looking a policy exclusions, however, the Court must be especially careful.

> Because of the complex terminology used in the policy and because the policy is in most cases prepared by the insurance company experts, we recognize that an insurance policy is a contract of adhesion between parties who are not equally situated. As a result, courts must assume a particularly vigilant role in ensuring their conformity to public policy and principles of fairness. Consistent with that principle, courts also endeavor to interpret insurance contracts to accord with the objectively reasonable expectations of the insured.

*Nav–Its, Inc. v. Selective Ins. Co.*, 183 N.J. 110, 869 A.2d 929, 933–34 (2005) (internal punctuation and citation omitted).

### 1. Whether the Relief Requested Constitutes "Damages"

■ As an initial matter, Defendant argues that none of the underlying complaints are seeking "damages," so that none of the suits are covered under the policy. Instead, according to Defendant, the suits seek only equitable relief in the form of medical monitoring, which is not "damages" under the CGL. Defendant observes that in the *Mignano* and *Kahana* class actions, the judge has expressly limited relief to medical monitoring. (Wynne Certification, Exh. A.) Plaintiffs respond first that all the underlying complaints seek money damages in addition to other forms of relief. Further Plaintiffs argue that "damages" should not be construed so narrowly as to exclude all equitable relief and that court-imposed medical monitoring, which would require Plaintiffs to pay the costs of such testing, is "damages" under the CGL policy. The Court finds, consistent with Plaintiffs' arguments and the New Jersey Supreme Court in *Morton Int'l, Inc. v. Gen. Accident Ins. Co.*, 134 N.J. 1, 629 A.2d 831 (1993), that all the underlying suits seek "damages" within the meaning of the CGL policy here.

First, all the underlying complaints do indeed seek traditional monetary damages that satisfy even Defendant's narrow definition of "damages." (*Mignano* Complaint Prayer for Relief; *Conti* Complaint ¶¶ 15–35; *Kahana* Complaint ¶¶ 191–225.) The relief has not been limited in *Conti* so there can be no dispute that this suit seeks traditional compensatory monetary damages that are "damages" under the CGL policy.

Second, the Court finds that court-ordered medical monitoring with costs to be paid by defendants as permitted under *Ayers v. Twp. of Jackson*, 106 N.J. 557, 525 A.2d 287 (1987), is "damages" under the CGL policy. In so finding, the Court is led by the decision in *Morton*, where the

---

**2.** In diversity actions such as this, state law governs the interpretation of an insurance contract. *Ruhlin v. New York Life Ins. Co.*, 304 U.S. 202, 205, 58 S.Ct. 860, 82 L.Ed. 1290 (1938). The parties appear to agree that New Jersey law should be applied and the Court has no basis to disagree. *See NL Indus-* *tries, Inc. v. Commercial Union Ins. Co.*, 65 F.3d 314, 319–20 (3d Cir.1995) ("[U]nder New Jersey choice of law rules, the law of the place of contracting should ordinarily be applied unless some other state has the 'dominant relationship' with the parties and issues.")

New Jersey Supreme Court held that the phrase "as damages" in a CGL policy, where damages is left undefined, should be given its "plain, non-technical meaning" and thus encompassed response costs imposed to remediate environmental damage. 629 A.2d at 843–47. The court rejected the insurer's argument that "damages" is limited to "traditional tort-liability money damages" and does not cover equitable remedies. *Id.* at 843–44. The *Morton* court relied on myriad authority to support its ultimate conclusion, and was "fully in accord" with the reasoning of Justice O'Hern, dissenting in *New Jersey Dep't of Envtl. Prot. v. Signo Trading Int'l, Inc.,* 130 N.J. 51, 612 A.2d 932 (1992)

> " 'Damages' means money to most people. Money is what DEP wants from [the insured]. One United States District Court in New Jersey has perhaps stated it best: In assessing what an insured would reasonably expect from a CGL policy, it reasoned that '[t]he average person would not engage in a complex comparison of legal and equitable remedies in order to define * * * damages, but would conclude based on the plain meaning of words that the cleanup costs imposed on [the insured] * * * would constitute an obligation to pay damages.' "

*Morton,* 629 A.2d at 846 (quoting *Signo,* 612 A.2d at 944).

The reasoning in *Morton* is equally applicable to the relief sought in the underlying suits here. In *Ayers* the New Jersey Supreme Court responded to the difficulties of mass-exposure tort cases where plaintiffs are unable to quantify the enhanced risk of future illness, but will require medical monitoring as a result of their exposure to harmful substances. 525 A.2d at 297–313. The court held "the cost of medical surveillance is a compensable item of damages where the proofs demon-strate" the risk of future illness and the necessity of testing. *Id.* at 313. The court ultimately concluded that rather than a lump-sum payment by defendants, "a court-supervised fund to administer medical-surveillance payments" is a more appropriate form of remedy. *Id.* at 314. Regardless of whether such relief is considered traditional compensatory damages or equitable relief, it still requires the defendant to pay money to cover the costs of medical monitoring. As the *Morton* court so aptly observed, most people would consider this court-ordered money to be "damages," so that medical monitoring costs must be paid "as damages" within the meaning of the CGL policy here. *See* 629 A.2d at 846.

While New Jersey courts have not directly addressed the question of whether costs for medical monitoring are "damages" in a CGL policy, Plaintiffs point the Court to an opinion from the Northern District of Illinois which the Court finds persuasive and consistent with the holding in *Morton.* In *Ace American Ins. Co. v. RC2 Corp., Inc.,* 568 F.Supp.2d 946 (N.D.Ill.2008), the court was faced with underlying complaints that sought both traditional compensatory damages and payment for the cost of medical monitoring to address exposure to lead. The court found as follows:

> When left undefined in a comprehensive general liability policy such as the ACE Policies, Illinois law accords "damages" a broad, nontechnical meaning that is not limited to compensatory damages and can include equitable relief . . .

> The underlying complaints at issue all seek monetary relief. As plaintiff concedes, some seek monetary damages for other property that was contaminated, which clearly is damages because of property damages. Others seek compensation for stress and anxiety. As

previously discussed, bodily injury includes being exposed to lead. Compensation for stress and anxiety related to such exposure would clearly be damages because of bodily injury. All of the cases seek compensation to pay for medical monitoring of underlying plaintiffs who have been exposed to lead contamination from the toys. Whether such relief is legal or equitable in nature does not matter. In either case, it requires payment or expenditure of funds to remediate bodily injury in the form of exposure to lead.

*Ace American,* 568 F.Supp.2d at 955–56. Thus, consistent with the New Jersey Supreme Court's reasoning in *Morton,* the costs of medical monitoring are "damages" in a standard CGL policy.

Of the cases cited by Defendant in support of a contrary conclusion, none will guide the Court. Defendant points to *Cincinnati Ins. Co. v. Milliken & Co.,* 857 F.2d 979, 981 (4th Cir.1988) for a narrow technical definition of "damages," but the New Jersey Supreme Court in *Morton* expressly rejected *Milliken,* among others. *Morton,* 629 A.2d at 844. The remaining cases cited by Defendant either fail to support Defendant's argument, *Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.,* 788 F.Supp. 846, 851–52 (D.N.J. 1992) (cleanup costs under CERCLA are "damages" under insurance policy), *Broadwell Realty Servs., Inc. v. Fidelity & Cas. Co. of N.Y.,* 218 N.J.Super. 516, 528 A.2d 76 (N.J.Super.Ct.App.Div.1987) (same), or are easily distinguishable, *XXL of Ohio, Inc. v. City of Broadview Heights,* 341 F.Supp.2d 825, 831 (N.D.Ohio 2004) (declaratory and injunctive relief expressly excluded by terms of insurance policy), *Headley v. St. Paul Fire and Marine Ins. Co.,* 712 F.Supp. 745, 749 (D.S.D.1989) (injunctive relief not covered where it did not involve payment of "a sum of money"). The Court consequently finds no reason

why the holding in *Morton* regarding payment for the costs of remediation should not by extended to payments for the costs of medical monitoring, and holds that such relief constitutes "damages" under the CGL policy presently at issue.

### 2. Whether the Harm Constitutes "Bodily Injury"

█ Defendant similarly argues that the underlying suits do not allege "bodily injury" and so do not require coverage. Plaintiffs respond that, with the exception of one named class plaintiff, the underlying suits do allege physical harm as a result of their exposure to mercury, but further that exposure to mercury constitutes "bodily harm" whether or not physical symptoms have yet manifested. As will be explained, the Court agrees with Plaintiffs and concludes that all of the underlying complaints have sufficiently alleged "bodily injury" so as to fall within the scope of the CGL policy.

Plaintiffs are correct that, with the exception of the named plaintiff in the *Mignano* class action, all the other underlying complaints specifically allege injury due to exposure to mercury. (*Conti* Complaint ¶¶ 12–14; *Kahana* Complaint ¶ 136.) Only the *Kahana* plaintiffs, however, point to specific physical symptoms arising from their exposure to mercury. Regardless, all underlying plaintiffs allege that they were exposed to mercury and that this exposure has increased the risk of illness for those plaintiffs. (*Mignano* Complaint ¶¶ 3, 119; *Conti* Complaint ¶¶ 12–14; *Kahana* Complaint ¶¶ 6, 8–11.) This constitutes "bodily injury" under the CGL policy.

The New Jersey Supreme Court has found that exposure to harmful substances, even when that exposure is not immediately accompanied by physical symptoms, can be "bodily injury" under a

CGL policy. In *Owens–Illinois, Inc. v. United Ins. Co.*, 138 N.J. 437, 650 A.2d 974 (1994), the New Jersey Supreme Court applied the continuous-trigger theory, which finds that the injury occurs at each exposure to asbestos, in order to assess when there was an "occurrence" which triggered insurance coverage for underlying toxic-exposure tort cases. Essential to this holding was the court's conclusion that exposure to asbestos, even without accompanying symptoms, was "bodily injury" due to the "increased likelihood of causing or contributing to disease." *Owens–Illinois*, 650 A.2d at 982–85. Though an asbestos case, the *Owens–Illinois* continuous trigger theory has been applied broadly. *Benjamin Moore & Co. v. Aetna Cas. & Sur. Co.*, 179 N.J. 87, 843 A.2d 1094 (2004) (applying *Owens–Illinois* to lead exposure case). The underlying plaintiffs here allege a similar harm, namely that they have been exposed to mercury and consequently face an increased likelihood of diseases, including cancer. This harm constitutes bodily injury, even though the symptoms have not yet appeared. *See Ayers*, 525 A.2d at 305 (finding that enhanced risk of disease is a tortiously-inflicted injury under the Tort Claims Act).

Other courts have similarly found that exposure to toxic substances that leads to an increased risk of disease, but without present symptoms, is "bodily injury" as defined by similar CGL policies. *Ace American*, 568 F.Supp.2d at 955 ("exposure to potentially harmful contaminants constitutes bodily injury even without manifestations of sickness or disease"); *Burt Rigid Box Inc. v. Travelers Property Cas. Corp.*, 126 F.Supp.2d 596, 638 (W.D.N.Y.2001) (allegations that underlying plaintiffs are at a high risk for developing cancer due to their exposure is "bodily injury"); *see Techalloy Co., Inc. v. Reliance Ins. Co.*, 338 Pa.Super. 1, 487 A.2d 820, 824–25 (1984) ("at a minimum, personal injury encompasses allegations of exposure to a hazardous substance, increased risk of injury, anxiety, various internal disorders and tissue damage"). Defendant's reliance on *HPF, L.L.C. v. General Star Indem. Co.*, 338 Ill.App.3d 912, 273 Ill.Dec. 162, 788 N.E.2d 753, 756–57 (2003), for the proposition that exposure to a harmful substance cannot be "bodily injury" is misplaced, because the underlying complaint at issue merely alleged that a herbal supplement was not "proven safe" as promised, in contrast to the present situation, where underlying plaintiffs allege that mercury is actually harmful and has caused them injury. For this reason the *HPF, LLC* court distinguished *Burt Rigid* and *Techalloy* to find that there was no allegation of "bodily injury." *HPF, LLC*, 273 Ill.Dec. 162, 788 N.E.2d at 756–57. Consequently, consistent with the New Jersey Supreme Court and other jurisdictions, the underlying complaints allegations that the plaintiffs were exposed to a toxic substance—mercury—and as a result have an increased risk of illness are allegations of "bodily injury" under the CGL policy here.

The underlying plaintiffs have brought suit to procure, among other things, the costs of medical monitoring "as damages" for the "bodily injury" they allegedly suffered due to exposure to dangerous levels of mercury and so the underlying suits fall within the general coverage of the CGL policy.

### 3. *Absolute Pollution Exclusion*

■ Defendant next maintains that all of the underlying suits fall within the CGL policy's absolute pollution exclusion because they involved a "pollutant"—mercury—and traditional environmental pollution. Plaintiffs respond that the pollution exclusion is inapplicable because the underlying claims regarding exposure to

mercury inside Kiddie Kollege do not arise from traditional environmental pollution and further that the pollution exclusion is ambiguous when applied to the Baughman's alleged negligent failure to investigate the risk of mercury contamination in Kiddie Kollege. For the reasons below, the Court concludes that the underlying claims against Plaintiffs do not arise from traditional environmental pollution and so cannot fall within the absolute pollution exclusion of the CGL policy.

The absolute pollution exclusion, and its predecessor the standard pollution exclusion, have generated tremendous amounts of litigation regarding the potentially enormous scope of pollution exclusions in CGL policies. The New Jersey Supreme Court has been particularly concerned with the potential breadth of these provisions, twice declining to apply the literal meaning of the exclusions in *Morton*, when looking at the standard exclusion, and most recently in *Nav–Its*, when looking at the absolute exclusion. In *Nav–Its* the court interpreted an absolute exclusion provision similar to the one at issue here and concluded that the scope of the absolute pollution exclusion "should be limited to injury or property damage arising from activity commonly thought of as traditional environmental pollution." 869 A.2d at 937. Consequently, the court found that the exclusion did not encompass an underlying suit by a physician exposed to fumes as a result of painting, coating and floor sealing work in his office. *Id.* at 930, 939.

The *Nav–Its* court does not provide much specific guidance on the meaning of "traditional environmental pollution," beyond the observation that the exclusion was intended to avoid liability for " 'environmental catastrophe related to intentional industrial pollution.' " 869 A.2d at 937 (quoting *Motorists Mut. Ins. Co. v. RSJ, Inc.,* 926 S.W.2d 679, 681 (Ky.Ct.App.

1996)); *see Merchants Ins. Co. of N.H., Inc. v. Hessler,* No. 03–5857, 2005 WL 2009902, at *3 (D.N.J. Aug. 18, 2005) ("Traditional environmental pollution was defined [in *Morton* ] as 'environmental catastrophe related to intentional industrial pollution.' "). Nevertheless, additional clues can be found in the cases from other jurisdictions on which the *Nav–Its* court relied, the facts of the underlying suit, and the language of the exclusion it was interpreting. All lead to the conclusion that traditional environmental pollution does not include exposure to toxic materials released indoors and thus does not include mercury contamination in Kiddie Kollege.

Several of the cases cites by the *Nav–Its* hold, among other things, that traditional environmental pollution necessarily only applies to those harms caused by toxic substances released out into the environment, in contrast to exposure to toxins released in a contained space. The *Nav–Its* court quoted with approval the observation of New York's highest court in *Belt Painting Corp. v. TIG Ins. Co.,* 100 N.Y.2d 377, 763 N.Y.S.2d 790, 795 N.E.2d 15, 18 (2003), that the absolute exclusion applies to "broadly dispersed environmental pollution." The *Belt Painting* court rejected the insurer's argument that a change in language "indicates an intent to extend the exclusion to indoor, as well as outdoor, pollution" relying on the use of the terms "discharge, dispersal, seepage, migration, release or escape"—language identical to the pollution exclusion this Court must now interpret. 763 N.Y.S.2d 790, 795 N.E.2d at 20. Consequently, the New York Court of Appeals declined to apply the pollution exclusion to injuries caused by the release of paint fumes indoors. *Id.*

The *Nav–Its* court was also led by the Illinois Supreme Court's decision in *American States Ins. Co. v. Koloms,* 177 Ill.2d 473, 227 Ill.Dec. 149, 687 N.E.2d 72 (1997),

where the court declined to apply the pollution exclusion to an underlying suit by persons who inhaled carbon monoxide from a defective furnace, stating:

> The pollution exclusion has been, and should continue to be, the appropriate means of avoiding " 'the yawning extent of potential liability arising from the gradual or repeated discharge of hazardous substances *into the environment.*' " (Emphasis in original.) [*West American Ins. Co. v. Tufco Flooring East, Inc.,* 104 N.C.App. 312, 409 S.E.2d 692, 699 (1991) ], quoting *Waste Management of Carolinas, Inc. v. Peerless Insurance Co.,* 315 N.C. 688, 698, 340 S.E.2d 374, 381 (1986). We think it improper to extend the exclusion beyond that arena.

*Koloms,* 227 Ill.Dec. 149, 687 N.E.2d at 81. Of those other opinions that the New Jersey Supreme Court relied upon, several similarly found support from case law making the distinction between indoor contamination and outdoor environmental exposure. *Kent Farms, Inc. v. Zurich Ins. Co.,* 140 Wash.2d 396, 998 P.2d 292, 295–96 (2000) (citing *Continental Cas. Co. v. Rapid-American Corp.,* 80 N.Y.2d 640, 593 N.Y.S.2d 966, 609 N.E.2d 506 (1993)); *Byrd ex rel. Byrd v. Blumenreich,* 317 N.J.Super. 496, 722 A.2d 598, 601 (N.J.Super.Ct.App.Div.1999) (citing *Lefrak Organization, Inc. v. Chubb Custom Ins. Co.,* 942 F.Supp. 949, 953 (S.D.N.Y.1996)).

The conclusion that indoor contamination does not constitute environmental pollution is reflected in the facts of *Nav–Its* and the case law on which the *Nav–Its* court relied. The underlying suit in *Nav–Its* involved exposure to fumes in an office building, while the other courts declined to apply the exclusion to exposure to pesticides sprayed inside an apartment building, *MacKinnon v. Truck Ins. Exchange,* 31 Cal.4th 635, 3 Cal.Rptr.3d 228, 73 P.3d 1205 (2003), carbon monoxide released

from a furnace in a two-story building, *Koloms,* 227 Ill.Dec. 149, 687 N.E.2d at 81, and paint fumes released in an office building, *Belt Painting,* 763 N.Y.S.2d 790, 795 N.E.2d at 18–20. Moreover, the text of the CSP policy considered by the *Nav–Its* court defined "pollution hazard" as exposure to pollutants "arising out of the discharge, dispersal, seepage, migration, release or escape of such 'pollutants'," 869 A.2d at 932, which is language that courts have interpreted to exclude indoor contamination. *Belt Painting,* 763 N.Y.S.2d 790, 795 N.E.2d at 20; *see Motorists Mut.,* 926 S.W.2d at 681. While the mere presence of contaminant outdoors is not necessarily sufficient, *see Byrd ex rel. Byrd v. Blumenreich,* 317 N.J.Super. 496, 722 A.2d 598 (N.J.Super.Ct.App.Div.1999) (exposure to fuel back-flowing from a delivery hose due to a faulty intake valve is not traditional environmental pollution), exposure to indoor contaminants is not traditional environmental pollution as defined by the New Jersey Supreme Court.

In the present case, the underlying suits all allege harm due to exposure to mercury contamination inside the Kiddie Kollege building. The *Mignano* class action is composed of "children who innocently and unknowingly occupied and attended the day care center contaminated with toxic mercury and mercury vapor." (*Mignano* Complaint ¶ 188.) The injured plaintiff in *Conti* "used the facility [Kiddie Kollege] for a substantial period of time and became exposed to mercury contamination during that time ..." (*Conti* Complaint ¶ 11.) The *Kahana* action was "brought on behalf of all those who require medical monitoring as a result of their exposure to mercury from the Kiddie Kollege Daycare & Preschool, a child care facility that had been located in a heavily contaminated facility on the site of a former mercury thermometer manufacturer." (*Kahana* Complaint ¶ 1.) All the complaints followed

NJDEP testing revealing indoor mercury at unacceptable levels. (*Kahana* Complaint ¶ 156.) The fact that some toxins might have spread beyond Kiddie Kollege does not change that fact that the underlying suits seek damages for bodily injury to Kiddie Kollege patrons arising from their exposure to mercury inside Kiddie Kollege.

The underlying suits against the Baughmans, which involve exposure to mercury at Kiddie Kollege, do not arise from traditional environmental pollution, but instead relate to a thermometer manufacturer's failure to cleaning the factory building before they left and the Baughman's failure to check the mercury levels within Kiddie Kollege. *See Nav–Its,* 869 A.2d at 937–38; *Belt Painting Corp.,* 763 N.Y.S.2d 790, 795 N.E.2d at 18–20. This mercury contamination did not arise from "contact with discharge, dispersal, seepage, release or escape of 'pollutants' " as the New Jersey Supreme Court and others have interpreted that phrase in the absolute exclusion provision of the CGL policy here. Consequently, Defendant is not excluded from defending Plaintiffs in the underlying suits because those suits do not fall within the scope of the absolute pollution exclusion provision.

### 4. *Stephen Baughman as Insured*

 Defendant maintains that Stephen Baughman is not covered under the insurance policy because he is not a named insured. Mr. Baughman is, however, undisputedly an employee of Kiddie Kollege, Becky Baughman's business. Section II(2)(a) of the CGL policy reads

SECTION II—WHO IS AN INSURED
. . .

2. Each of the following is also an insured

a. Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business ...

(Becky Baughman Certification, Exh. A.) Defendant has offered no evidence, and the Court can discover none in this record, to show that Mr. Baughman was an "executive officer," meaning "a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document." (*Id.*) In fact, Defendant offers no argument for why Mr. Baughman is not ensured as an employee of "Becky Baughman d/b/a Kiddie Kollege"—the named insured. In the absence of any evidence to the contrary, the Court finds that Mr. Baughman was insured as an employee under Section II(2)(a) of the CGL policy.

### 5. *Conclusion*

 In sum, the Court finds that Defendant is obligated to defend and indemnify both Becky and Stephen Baughman in the three underlying suits, for those suits seek "damages" for "bodily injury" and are not within the scope of the absolute pollution exclusion.[3] Therefore, Plaintiffs are entitled to summary judgment on their claims

---

**3.** Defendant argues, correctly, that it has no obligation to cover the intentional tort of battery. Nevertheless, "if 'multiple alternative causes of action,' are alleged in the complaint, the insurer's duty to defend continues 'until every covered claim is eliminated.' " *Sahli v. Woodbine Bd. of Educ.,* 193 N.J. 309, 938 A.2d 923, 930 (2008) (quoting *Voorhees v. Preferred Mut. Ins. Co.,* 128 N.J. 165, 607 A.2d 1255, 1259 (1992)).

of breach of contract and declaratory judgment.

## C. Plaintiffs' Additional Causes of Action

In addition to their claims seeking coverage, Plaintiffs also allege that Defendant's committed fraud and acted in bad faith by declining coverage. (Compl. ¶¶ 96–133). Plaintiffs seek additional relief through common law claims of breach of good faith and fair dealing as well as fraud, and treble damages for violations of the New Jersey Consumer Fraud Act ("NJCFA"), based on Defendant's "misrepresentations" regarding the scope of insurance coverage. Defendant seeks summary judgment on these claims, arguing that in essence Plaintiffs dispute Defendant's reasonable interpretation of the insurance contract, which is not a basis for liability for fraud or bad faith. For the reasons set forth below, the Court agrees with Defendant and will dismiss Plaintiffs' common law and statutory claims of fraud and bad faith.

### 1. Breach of Implied Duty of Good Faith and Fair Dealing

 "To show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Pickett v. Lloyd's,* 131 N.J. 457, 621 A.2d 445, 453 (1993) (internal citations omitted). Thus a plaintiff alleging bad faith on the part of an insurance company for the denial of coverage cannot succeed "[i]f a claim is fairly debatable." *Id.* (internal citations omitted). In the present case, the Court finds that there was a reasonable basis for Defendant's decision to decline coverage, given the potential expanse of a literal reading of the absolute pollution exclusion and the technical meaning of "damages."

Therefore the Court will grant Defendant summary judgment as to Plaintiffs' claims of bad faith.

### 2. Common Law Fraud and NJCFA

 A claim of common law fraud requires, among other things, a material misrepresentation of presently existing or past fact. *Simpson v. Widger,* 311 N.J.Super. 379, 709 A.2d 1366, 1373 (N.J.Super.Ct.App.Div.1998) (citing *Jewish Ctr. of Sussex County v. Whale,* 86 N.J. 619, 432 A.2d 521 (1981)); *Joseph J. Murphy Realty, Inc. v. Shervan,* 159 N.J.Super. 546, 388 A.2d 990, 993 (N.J.Super.Ct.App.Div.1978) (citing *Anderson v. Modica,* 4 N.J. 383, 73 A.2d 49 (1950)). Consequently, fraud cannot be based on a difference of opinion. *Shervan,* 388 A.2d at 993.

> The distinction between fact and opinion is broadly indicated by the generalization that what was susceptible of exact knowledge when the statement was made is usually considered to be a matter of fact. Representations in regard to matters not susceptible of personal knowledge are generally to be regarded as mere expressions of opinion, and this is held to be so even though they are made positively and as though they are based on the maker's own knowledge. Usually, also, to say that a thing is only matter of opinion imports that it is unsusceptible of proof.

*Id.* (quoting 37 Am.Jur.2d, Fraud and Deceit, s 46 at 74).

Defendant's letters declining coverage do not include misrepresentations of fact, but rather are expressions of opinion regarding the proper interpretation of the contract. As previously discussed, the scope of coverage under the CGL policy at issue, given the facts of this case, was fairly debatable. The mere fact that Defendant's opinions were, in large part (but

not in total), erroneous does not make them misrepresentations of fact necessary to establish fraud. Summary judgment in favor of Defendant on Plaintiffs' common law fraud claim is appropriate.

A similar problem undermines Plaintiffs' NJCFA claims, which are based on the same alleged "misrepresentations" underlying Plaintiffs' common law fraud claims. The New Jersey Supreme Court has stated: "[N]ot just any erroneous statement will constitute a misrepresentation prohibited by the [NJCFA]. The misrepresentation has to be one which is material to the transaction and which is a statement of fact, found to be false ..." *Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 691 A.2d 350, 366 (1997). Consequently, statements of opinion are not misrepresentation prohibited by the CFA. *Kern v. Huettl,* No. A–1217–07T2, 2009 WL 2461074, at \*5 (N.J.Super.Ct.App.Div. Aug. 13, 2009) (citing *Gennari,* 691 A.2d at 366). Defendant's statements of opinion regarding the scope of the insurance policy, even if not Defendant's true opinion, are not the basis for a CFA claim.

In arguing to the contrary, Plaintiffs rely on *Weiss v. First Unum Life Ins. Co.,* 482 F.3d 254, 266 (3d Cir.2007), where the Third Circuit held that "[t]he CFA covers fraud both in the initial sale (where the seller never intends to pay), and fraud in the subsequent performance (where the seller at some point elects not to fulfill its obligations)." In *Weiss,* the plaintiff alleged that the insurance company intentionally failed to investigate his claim and engaged in a broad scheme of defrauding customers. *Id.* at 257. The Court of Appeals explained that Weiss "aver[ed] not merely a bad-faith denial of benefits limited to his case, but rather that his denial [was] one instance in a pattern of fraudulent activity by [the insurance company] aimed at depriving its insureds with large

disability payouts of their contractual benefits." *Id.* By contrast, Plaintiffs allege only that Defendant misrepresented the scope of their insurance policy. The Court finds that this difference of opinion is not a basis for CFA liability. Having failed to allege or establish any fraud by Defendant, Plaintiffs' claim under the CFA cannot survive. *See Van Holt v. Liberty Mut. Fire Ins. Co.,* 163 F.3d 161, 168 (3d Cir. 1998) ("The mere denial of insurance benefits to which the plaintiffs believed they were entitled does not comprise an unconscionable commercial practice [under the NJCFA]."). The Court will grant Defendant summary judgment on Plaintiffs' NJCFA claim.

## III. CONCLUSION

For the foregoing reasons, the Court will enter an order declaring Defendant's obligation to defend and indemnify Plaintiffs Becky and Stephen Baughman in the underlying state court actions, grant summary judgment in favor of Plaintiffs as to liability for breach of the insurance contract. The Court will grant summary judgment to Defendant as to Plaintiffs' claims for breach of implied duty of good faith and fair dealing, common law fraud, and violations of the NJCFA. As Plaintiffs have voluntarily dismissed their claims for reformation, the Court will further grant summary judgment for Defendant on those claims.

The accompanying Order shall be entered.

## ORDER

This matter having come before the Court upon Plaintiffs' motion for partial summary judgment [Docket Item 10] and Defendant's cross-motion for summary judgment [Docket Item 13]; the Court having considered the submissions in support thereof and opposition thereto; for

the reasons discussed in the Opinion of today's day; and for good cause shown;

IT IS this **12th** day of **November, 2009** hereby

ORDERED that Plaintiffs' motion for partial summary judgment shall be, and hereby is, GRANTED, and it is ADJUDGED that Defendant is liable to Plaintiffs Becky Baughman and Stephen Baughman for breach of contract;

AND IT IS FURTHER ORDERED, ADJUDGED and DECLARED that Defendant shall defend and indemnify Plaintiffs Becky Baughman and Stephen Baughman in the underlying state court suits *Mignano v. Jim Sullivan, Inc.*, Docket No. GLO–L–1309–06, *Conti v. Jim Sullivan, Inc.*, Docket No. L–1617–06, and *Kahana v. Accutherm, Inc.*, Docket No. L–1823–06, consistent with this opinion;

AND IT IS FURTHER ORDERED that Defendant's motion for summary judgment shall be, and hereby is, GRANTED IN PART AND DENIED IN PART as follows

(1) Defendant is GRANTED summary judgment on Plaintiffs' claims for breach of implied duty of good faith and fair dealing, common law fraud, reformation, and for violations of the New Jersey Consumer Fraud Act.

(2) Defendant is DENIED summary judgment on Plaintiffs' claims for declaratory judgment and breach of contract.