**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1472-18T2

SALLIE SCHONEBOOM,

    Plaintiff-Appellant,

v.

ALLSTATE NEW JERSEY
INSURANCE COMPANY,
ANNE H. MOCKRIDGE, and
OSCAR A. MOCKRIDGE, III,

    Defendants-Respondents,

and

THE POWDERHORN AGENCY,
INC., a/k/a THE PROGUARD
PROGRAM, MITCHELL SUPREME
FUEL COMPANY, and ACT
TECHNOLOGIES, INC., a/k/a
ADVANCED TANK SERVICES
COMPANY,

    Defendants.

_____

Argued November 4, 2019 – Decided March 19, 2020

Before Judges Fasciale and Rothstadt.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-6653-12.

Howard P. Davis argued the cause for appellant (The Law Office of Howard Davis, PC, attorneys; Howard P. Davis, of counsel and on the brief; Anne Ronan and Robert Gorrie, on the briefs).

David J. D'Aloia argued the cause for respondent Allstate New Jersey Insurance Company (Saiber LLC, attorneys; David J. D'Aloia and Amy K. Smith, on the brief).

PER CURIAM

Plaintiff Sallie Schoneboom appeals from the Law Division's October 26, 2015 order denying her motion for partial summary judgment and granting defendant Allstate New Jersey Insurance Company's (Allstate) motion for summary judgment and dismissing her complaint.[1] In her complaint, plaintiff, whose residential property was insured by Allstate, sought a declaration of coverage for the costs associated with the environmental cleanup of her property and the surrounding areas, which was caused by an underground storage tank (UST) that leaked fuel oil

---

[1] Plaintiff also appeals from the October 24, 2018 final judgment entered in this matter against plaintiff and the previous owners of her home, defendants Anne and Oscar Mockridge, equally allocating the clean-up costs between them. However, neither plaintiff nor Allstate briefed this issue and the Mockridges have not appealed. Under these circumstances we deem the appeal from the final judgment to be waived. See N.J. Dep't of Envtl. Prot. v. Alloway Township, 438 N.J. Super. 501, 505-06 n.2 (App. Div. 2015).

into the soil and groundwater. Allstate denied coverage because it contended that its policy contained exclusions that applied to such leaks unless they were "sudden and accidental." Relying on the Court's definition of "sudden and accidental" as stated in Morton International, Inc. v. General Accident Insurance Co. of America, 134 N.J. 1 (1993), and distinguishing this case from the Court's reasons for not applying its definition in Morton, the motion judge granted Allstate's motion.

On appeal, plaintiff argues that we should reverse the motion judge's decision because "sudden and accidental" is a term of art with a judicially established meaning under Morton and should have been similarly applied here. In the alternative, even if the phrase was applied literally, plaintiff contends it was an error to allow Allstate to deny coverage. Plaintiff also argues that Allstate should be bound by the "[r]easonable [e]xpectations [r]ule" and that the motion judge erroneously relied on extrinsic evidence in issuing her decision. We reverse as we conclude the motion judge incorrectly rejected the established meaning of "sudden and accidental" under Morton.

I.

The Property and the UST

The material facts are not in dispute and are summarized as follows. The property insured by Allstate was improved by a single-family home that had been

3

owned by the Mockridges for approximately thirty-four years, beginning in 1971. During that time, the Mockridges used a fuel oil system, "which included a 550 gallon" UST that was serviced and maintained by defendant Mitchell Supreme Fuel Company (Mitchell).

While the Mockridges owned the home, they maintained an accidental release service plan through Mitchell (the Mitchell Plan) that covered a cleanup for any contamination caused by the UST leaking. The Mockridges also had a contract with defendant ACT Technologies Incorporated, a/k/a Advanced Tank Services Company (Advanced) to "test[], inspect[], maintain[], repair, monitor[], extract[], remov[e] and" perform other related services with regard to the fuel system and UST. They entered into that contract "with the intention of obtaining information and assurances as to the environmental condition of the UST and [p]roperty that they could provide to any potential purchaser," who would be an intended beneficiary of the contract. On June 17, 2005, Advanced inspected and tested the UST and informed the Mockridges that the tank "did not [have] any detectable leaks and certified that [it] . . . had a leak status of 'Pass.'" Nevertheless, at some point during their ownership, a discharge occurred from the UST.

In 2006, the Mockridges sold the property to plaintiff. The Mockridges provided plaintiff with Advanced's certification and assigned the Mitchell Plan to

4

plaintiff. After plaintiff purchased the property, she continued to purchase heating oil from Mitchell, which also remained responsible for repair and maintenance services for the UST.

On September 1, 2009, the Mitchell Plan was replaced with a plan issued by defendant The Powderhorn Agency, Incorporated a/k/a The ProGuard Program (the ProGuard Plan), which provided that Mitchell, ProGuard, or both would pay or reimburse plaintiff for contamination cleanup costs related to an accidental release from the UST. The ProGuard Plan also provided coverage for "expenses related to replacing the UST with an above-ground storage tank ('AST')." Additionally, in September 2009, Mitchell recommended that plaintiff replace the UST with an AST, per the coverage provided. Plaintiff followed that recommendation and between September and December 2009, a new AST was installed, "and the UST was decommissioned."

Allstate's Policy

When plaintiff took title to the Montclair property, she purchased homeowners insurance from Allstate, effective May 1, 2006. As part of the application, there was an oil tank certification that required plaintiff's initials. It stated that "I am not eligible to purchase the Oil Tank Liability Protection Endorsement because I have an oil tank [ten] or more years old, that is NOT above

A-1472-18T2

ground and indoors on a solid masonry floor, or only a permanently decommissioned/abandoned oil tank, on the premises."

The policy issued by Allstate contained several exclusions. They included the following:

> 4. Water or any other substance on or below the surface of the ground, regardless of its source. This includes water or any other substance which exerts pressure on, or flows, seeps or leaks through any part of the residence premises.
>
> . . . .
>
> 13. Soil conditions, including, but not limited to, corrosive action, chemicals, compounds, elements, suspensions, crystal formations or gels in the soil.
>
> 14. Discharge, dispersal, seepage, migration, release or escape of pollutants . . . . Pollutants mean any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, . . . chemicals, and waste. Waste includes materials to be recycled, reconditioned, or reclaimed.
>
> In addition, we do not cover loss consisting of or caused by any of the following:
>
> 15. a) [w]ear and tear, aging, marring, scratching, deterioration, inherent vice, or latent defect.
>
> . . . .
>
> d) [r]ust or other corrosion.
>
> . . . .

18. Seepage, meaning continuous or repeated seepage or leakage over a period of weeks, months, or years, of water, steam or fuel:

a) from a plumbing, heating, airconditioning or automatic fire protection system or from within a domestic appliance; or

b) from, within or around any plumbing fixtures, including, but not limited to, shower stalls, shower baths, tub installations, sinks or other fixtures designed for the use of water or steam.

. . . .

22. Planning, [c]onstruction, or [m]aintenance, meaning faulty, inadequate or defective:

a) planning, zoning, development, surveying . . . ;

b) design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

c) materials used in repair, construction, renovation or remodeling; or

d) maintenance . . . .

There was also no coverage for "property damage to property owned by an insured person whenever any benefit of this coverage would accrue to an insured person." The policy also included the following provisions:

15. We do not cover . . . property damage consisting of or caused by, the discharge, dispersal, release or escape of oil, fuel oil, kerosene, liquid propane or gasoline intended

7

for or from storage tank(s) located at the address stated on the Policy Declarations. <u>This exclusion does not apply when the discharge, dispersal, release or escape is sudden and accidental</u>.

16. We do not cover any liability imposed upon any insured person by any governmental authority . . . for property damage consisting of or caused by the discharge, dispersal, release or escape of oil, fuel oil, kerosene, liquid propane or gasoline intended for or from storage tank(s) located at the address stated on the Policy Declarations. <u>This exclusion does not apply when the discharge, dispersal, release or escape is sudden and accidental</u>.

17. We do not cover any loss, cost or expense arising out of, consisting of or caused by any request, demand or order that any insured person test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize or in any way respond to or assess the effects of oil, fuel oil, kerosene, liquid propane or gasoline intended for or from storage tank(s) located at the address stated on the Policy Declarations. <u>This exclusion does not apply when the discharge, dispersal, release or escape of oil, fuel oil, kerosene, liquid propane or gasoline is sudden and accidental</u>.

[(Emphasis added).]

The exclusion and the "sudden and accidental" exception to it had been approved by the New Jersey Department of Banking and Insurance (DOBI) in 2004. When Allstate made the application to include that language, it disclosed to DOBI that its intent was to not provide coverage for its insureds' costs associated with leaks from fuel tanks due to corrosion.

A-1472-18T2

When plaintiff obtained her Allstate policy, she also received a notice regrading oil tanks being excluded from coverage, "other than for a sudden and accidental loss," but that if she installed a new tank, she could purchase coverage for damages caused by other leaks as well. The notice stated that, "if you have an oil tank, liability losses or damages you incur because of a discharge of oil for example, from your oil tank, other than for a sudden and accidental loss, will not be covered by your Allstate New Jersey homeowners policy." (Emphasis added). The notice also suggested plaintiff consider purchasing oil tank liability protection "if [she] replace[d] [her] existing tank with a new one. If [she had] a tank that [did not] meet [Allstate's] eligibility requirements, perhaps [it was] time to replace it and then make sure that [she was] protected with this coverage." (Emphasis added).

Regardless of the contents of Allstate's policy, according to plaintiff, it was not her practice to "review insurance policies, service plans, [or] other documentation of that type." She did not read the insurance policy from Allstate when she bought the house and would "file [policy declarations and policy forms] without reviewing them." She believed that the Mitchell Plan would "provide the necessary coverage" in the event of a leak from the UST.

The Failure of the UST and Plaintiff's Claim

In July 2010, the UST failed a tank evaluation test, which plaintiff reported to ProGuard. The tank was removed by an environmental contractor in August 2010, at which time it was discovered that the UST had eight or more holes and had been leaking, causing soil, subsoil, and groundwater contamination. It was later determined that the leak began sometime between 1969 and 1975 and continued leaking through 2010.

On August 24, 2010, plaintiff filed a claim with Allstate, which promptly rejected the claim without conducting an investigation because the policy did not provide coverage for a fuel tank leak. A year later, plaintiff demanded that Allstate withdraw its prior denial to avoid litigation and that it conduct a proper environmental investigation. According to plaintiff, the contamination was covered because it was not the result of an intentional act and to deny coverage without an investigation amounted to bad faith.

In response, Allstate withdrew its denial of coverage under a reservation of rights and retained an environmental specialist to perform the investigation. Plaintiff retained her own consultant to be onsite when samples were taken and to conduct its own independent analysis. Allstate's and plaintiff's environmental investigations, which included numerous tests of soil samples, confirmed that soil and groundwater

contamination were present at the property. Based on those findings, in a coverage diary entry, Allstate indicated that "[t]he observation of free phase oil seems to indicate a coverage trigger . . . ."

Plaintiff sent a letter to Allstate on July 17, 2012, stating that the results evidencing groundwater contamination triggered coverage under the policy. She requested immediate coverage and further evaluation of the extent of the contamination. Allstate issued a denial of coverage on September 7, 2012, based upon its investigation not "disclos[ing] any covered loss or occurrence under the Policy." It explained that no coverage existed because "the leaking UST [did] not result[] in a sudden and accidental direct physical loss." (Emphasis added). It noted that coverage was not provided for "land or its replacement, restoration or stabilization." Allstate also advised that no coverage was available "because the leaking UST [did] not cause[] property damage arising from an occurrence."

The Litigation

On September 13, 2012, plaintiff filed her complaint against Allstate, alleging breach of contract; bad faith denial; delay; and violation of the covenant of good faith and fair dealing; and violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 to -20. She also sought judgment declaring that the policy covered the loss, requiring Allstate to "defend and indemnify [p]laintiff against" loss and liability

based on the contamination, granting her specific performance under the contract, and "[d]eclaring and adjudicating [her] rights and obligations . . . under the . . . polic[y] with respect to . . . past and future liabilities for the environmental claims."

Allstate filed its answer on October 25, 2012.[2]  It denied the allegations and asserted twenty-six separate affirmative defenses, including that "[t]here [was] no coverage under the Policy for the losses alleged in the [c]omplaint because the leaking [UST was] not a sudden and accidental direct physical loss."  Citing to its policy's exclusions, Allstate reiterated in its separate defenses that there was no coverage provided.  After plaintiff later amended her complaint to join the other defendants in this matter, Allstate filed crossclaims for contribution and indemnification against them as well.

Plaintiff filed a motion for partial summary judgment in February 2014. Allstate filed a cross-motion seeking summary judgment and on May 30, 2014, the parties appeared before the motion judge for oral argument.

In an oral decision placed on the record on October 22, 2015, the judge denied plaintiff's motion and granted Allstate's, dismissing plaintiff's complaint against Allstate with prejudice.  At the outset, the judge noted that plaintiff's

---

[2]  Defendant also filed for declaratory judgment against plaintiff that no coverage existed.  The complaint was ultimately dismissed.

"interpretation of the term 'sudden' render[ed] the exclusion of basic nullity" and "essentially[ rewrote] the exclusion to be one that [was] applicable only to that small category of insureds who would purchase a home and a homeowner's insurance policy actually expecting [a UST] to leak." The judge noted that the Morton Court determined for a disbursal of fuel or other pollutant to be sudden, it must begin abruptly, which was a "temporal quality, albeit, it may last a long time or a short time, but . . . the beginning of it is abrupt." Because the event causing a gradual deterioration must be abrupt, the judge found that Morton did not support plaintiff's argument that "general deterioration without some other abrupt event that causes it can be considered sudden as defined in the policy exclusion." The judge also cited to ACL Technologies, Inc. v. Northbrook Property & Casualty Insurance, 22 Cal. Rptr. 2d 206 (Cal. Ct. App. 1993) for the proposition that sudden does not mean both unexpected and gradual. While she noted that the leakage may have been accidental and unexpected, the holes in the tank were caused from corrosion and the leak itself was gradual.

The judge then addressed the regulatory estoppel applied in Morton. She noted that the insurance industry "misled . . . regulatory authorities when it sought approval of the sudden and accidental . . . language." In distinguishing this case, the judge noted that Allstate was "very up front [in] what [it] w[as] attempting to do"

when applying for approval for its policy's language and explained that it should not have to pay for leaks caused by failure to maintain tanks.

The judge further explained that any argument regarding plaintiff's reasonable expectation that she would have coverage was without merit given the notices in the policy about oil tank liability protection. The judge also noted that any claims regarding Allstate's failure to act in good faith were likewise without merit because, while it originally denied coverage, Allstate subsequently performed an investigation under a reservation of rights before it denied coverage again. The judge entered the order memorializing her decision on October 26, 2015.

Thereafter, plaintiff resolved her claims against the remaining defendants, except for the Mockridges. After plaintiff amended her complaint to include a claim under the New Jersey Spill Compensation and Control Act (the Spill Act), N.J.S.A. 58:10-23.11 to -23.34, her claims against the Mockridges were addressed by a different judge. On August 22, 2018, that judge issued a written decision in which he determined that the leak began during the Mockridges' ownership, and discharges from the UST continued after plaintiff acquired title to the premises. For that reason, he concluded that both parties were "equally responsible for clean[]up costs," as they both used the UST in the same way and

released the same pollutants into the ground. The judge entered a final judgment on October 24, 2018, allocating the costs of the cleanup. This appeal followed.

## II.

On appeal, plaintiff argues that the motion judge did not apply Allstate's "sudden and accidental" provisions consistent with the Court's holding in Morton and, in the alternative, even under a literal application of that clause, it was error to deny coverage. Moreover the "reasonable expectation" rule compelled a finding of coverage and, in any event, the judge improperly "rel[ied] on extrinsic evidence in determining coverage under the fuel oil pollution exclusions at issue in this case."

We review a court's grant of summary judgment de novo, "apply[ing] the same standard as the trial court." Conley v. Guerrero, 228 N.J. 339, 346 (2017). The motion "judge's conclusions and interpretation of the record are not entitled to our deference." Wear v. Selective Ins., 455 N.J. Super. 440, 453 (App. Div. 2018). Summary judgment must "be granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law."

15

Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016) (quoting R. 4:46-2(c)).

Initially, we observe that "exclusions in insurance policies are presumptively valid and enforceable 'if they are "specific, plain, clear, prominent, and not contrary to public policy."'" Wear, 455 N.J. Super. at 454 (quoting Flomerfelt v. Cardiello, 202 N.J. 432, 441 (2010)). Typically, exclusions are construed narrowly. Ibid. However, we will "not . . . disregard the 'clear import and intent' of a policy's exclusion," ibid. (quoting Flomerfelt, 202 N.J. at 442), but we will not enforce even a "conspicuous, plain and clear" exclusion if it "misleads," Sosa v. Massachusetts Bay Ins., 458 N.J. Super. 639, 652 (App. Div. 2019) (quoting Gerhardt v. Cont'l Ins., 48 N.J. 291, 298 (1966)).

The Court in Morton addressed a similar exclusion in a commercial general liability policy and determined for public policy reasons the "sudden and accidental" exception should not be given its plain meaning.[3] 134 N.J. at 28-29.

---

[3] In our opinion in J. Josephson, Inc. v. Crum & Forster Insurance, 293 N.J. Super. 170, 191 (App. Div. 1996) we summarized the facts in Morton as follows:

> In Morton our Supreme Court settled the vexing questions of how the standard pollution exclusion clause and the definition of a covered "occurrence" found in [commercial general liability] policies should be interpreted where claims for coverage were based on

In determining the proper application of a "sudden and accidental" provision relating to environmental claims under a general commercial liability policy, the Court initially applied the well-settled rule that "courts should give the policy's words 'their plain, ordinary meaning.'" Wear, 455 N.J. Super. at 453 (quoting Nav-Its, Inc. v. Selective Ins. Co. of Am., 183 N.J. 110, 118 (2005)); see also Morton, 134 N.J. at 56. However, it held that despite the "sudden and accidental" exception's ordinary meaning, in the context of exceptions to

environmental pollution. There, the insured sought coverage for cleanup costs related to the remediation of Berry's Creek, a waterway polluted by discharges from a mercury processing plant operated for over forty years by Morton's predecessors. Morton sought coverage under policies which provided indemnification for property damage "resulting from an occurrence" except where that property damage arose out of the discharge, dispersal, release or escape of contaminants or pollutants in or upon land. That exclusion, however, did not apply if "such discharge, dispersal, release or escape is sudden and accidental." An occurrence was defined as an "unexpected event or happening . . . or a continuous or repeated exposure to conditions" resulting in property damage "provided the insured did not intend or anticipate that injury to or destruction of property would result."

[(Alteration in original) (emphasis added) (citations omitted).]

A-1472-18T2

contamination exclusions, a different meaning would be applied.  Morton, 134 N.J. at 28-29.

In explaining the plain language of the exception, the Court noted that "sudden" is a "temporal element, generally connoting an event that begins abruptly or without prior notice or warning," but clarified that "the duration of the event . . . is not necessarily relevant to whether the inception of the event is sudden."  Id. at 29.  It does not matter how long the event lasted but the focus is rather on the "inception of the event."[4]  Ibid.  The Court specifically stated "'sudden' events may begin abruptly, and continue undetected for a significant period," and that the "gradual deterioration of a pipeline or container is not necessarily inconsistent with a 'sudden' discharge of pollutants."  Id. at 72 (emphasis added); but see ACL Techs., Inc., 22 Cal. Rptr. 2d at 212 ("[T]he 'sudden and accidental' language in the . . . pollution exclusion does not allow for coverage for gradual pollution.").  It also explained that "accidental" referred to discharges of pollutants that "occur abruptly or unexpectedly and are unintended."  Morton, 134 N.J. at 29.

---

[4] Contrary to Allstate's focus on "sudden and accidental" applying to plaintiff's "direct physical loss" in denying coverage, the Court's application of "sudden and accidental" looks to the inception of the cause of the loss.  Ibid.

Instead of applying the plain meaning of the exception to the exclusion, the Morton Court expressly "limit[ed its] holding concerning the limited effect of the pollution-exclusion clause to cases in which the insured or an agent specifically authorized to act for the insured intentionally discharges a known pollutant." Id. at 78. The Court rejected the application of the exclusion's plain language as suggested by insurers at that time because it would severely limit any situations where coverage would apply. Id. at 29.

Relying on the industry's representations at the time the policy language was approved by DOBI, the Court concluded insurers were estopped from asserting that application. Id. 74-76. The Court "declined to enforce the standard pollution exclusion clause [exception] as written" because

> [w]hen the standard pollution exclusion clause was presented to state insurance regulatory agencies, the industry maintained that the exclusion would simply clarify existing coverage and there would be a continuation of coverage for pollution-caused injuries which resulted from an accident. However, the language of the clause did not support that representation. Rather, the clause virtually eliminated pollution-caused property damage coverage.
>
> [J. Josephson, Inc., 293 N.J. Super. at 192 (citation omitted) (citing Morton, 134 N.J. at 29).]

In Morton,

[t]he touchstone of [the Court's] decision . . . was that the insurance industry may not seek approval of a clause restricting coverage for the asserted reason of avoiding catastrophic environmental pollution claims and then use that same clause to exclude coverage for claims that a reasonable policyholder would believe were covered by the insurance policy.

[Nav-Its, Inc., 183 N.J. at 124.]

Thus, "under Morton[, u]nless the insurer establishes that the insured intentionally discharged a known pollutant or had specifically authorized an agent to act for it in intentionally discharging a known pollutant, the pollution exclusion clause will not bar coverage." J. Josephson, Inc., 293 N.J. Super. at 200; see also Chem. Leaman Tank Lines v. Aetna Cas. & Sur. Co., 89 F.3d 976, 990-91 (3d Cir. 1996) (finding that even though the insurer in that case did not make any misrepresentations, the Third Circuit held that Morton still controlled and the "sudden and accidental" exception would apply as interpreted by the New Jersey Supreme Court).

After Morton, in order for the exclusion to apply, a court must determine through a "case-by-case analysis . . . the existence of 'exceptional circumstances that objectively establish the insured's intent to injure [the environment].'" J. Josephson, Inc., 293 N.J. Super. at 201 (second alteration in original) (quoting Morton, 134 N.J. at 86). This includes considering

> the duration of the discharges, whether the discharges occurred intentionally, negligently, or innocently, the quality of the insured's knowledge concerning the harmful propensities of the pollutants, whether regulatory authorities attempted to discourage or prevent the insured's conduct, and the existence of subjective knowledge concerning the possibility or likelihood of harm.
>
> [Ibid. (quoting Morton, 134 N.J. at 86-87).]

Additionally, after Morton, the Court's definition of "sudden and accidental" became the established meaning for the same term in policies addressing coverage for contamination and cleanup. As the Court observed, courts have relied "on the principle that '[t]he judicial construction placed upon particular words or phrases made prior to the issuance of a policy employing them will be presumed to have been the construction intended to be adopted by the parties.'" Morton, 134 N.J. at 57 (alteration in original) (quoting 2 George J. Couch, Couch on Insurance 2d § 15:20 at 195-96 (Mark S. Rhodes rev. vol. 1984)); see also Nav-Its, Inc., 183 N.J. at 124 ("The drafters' utilization of environmental law terms of art ('discharge,' 'dispersal,' . . . 'release' or 'escape' of pollutants) reflects the exclusion's historical objective-avoidance of liability for environmental catastrophe related to intentional industrial pollution." (alteration in original) (quoting Motorists Mut. Ins. Co. v. RSJ, Inc., 926 S.W.2d 679, 681 (Ky. Ct. App. 1996))). For that reason, insurers who continued to

include the "sudden and accidental" language were bound by the Court's determination of its meaning. See Champion Dyeing & Finishing Co. v. Centennial Ins., 355 N.J. Super. 262, 266-67 (2002) (explaining that "any restrictive effect intended by adoption of [the sudden and accidental] exclusion was substantially nullified by the courts" after the decision in Morton).

For example, in Chemical Leaman, the Third Circuit continued to follow Morton's limited application of the sudden and accidental exception, even though the insurer argued that it was "not party to the misrepresentations made to regulatory authorities." 89 F.3d at 991. The Third Circuit rejected that argument, concluding that the insurer "benefitted from the misleading explanation of the effect of the standard pollution exclusion submitted to state regulators by insurance industry trade groups," and the court believed that "the New Jersey Supreme Court would not enforce the term 'sudden' in the policies issued by the" in the manner suggested by the insurer. Id. at 992.

We reject Allstate's arguments here, as accepted by the motion judge, that it is not bound by Morton because in 2004 it obtained DOBI approval to include in its policies the language of the subject exclusion and its exception, and in doing so disclosed its desire to exclude coverage for costs associated with gradual oil tank leaks from its policies. There is no language in Morton limiting

its holding to the circumstances of that case. To limit the holding, as Allstate suggests, would require a court in every disputed coverage claim to investigate the insurer's conduct before regulatory authorities in every case, a result not suggested by Morton.

Applying Morton here, as Allstate admits, when it sought approval of the "sudden and accidental" language in its policies, it explained that it should not be required to cover losses that result from a lack of maintenance, as that is not "sudden and accidental." As already noted, consistent with Morton, a leak is not "sudden and accidental" if there is evidence of a failure to maintain. As the Morton Court observed after reviewing the split among state and federal courts on the issue, see Morton 134 N.J. at 44-71, the gradual deterioration of a tank is not inconsistent with a sudden discharge nor is there anything intentional, as compared to accidental, about such an occurrence at its inception. In order to make it inconsistent and intentional, there must be some evidence that the insured failed to act or acted intentionally by ignoring a known hazard.

Here, Allstate never supported its motion with evidence that plaintiff was negligent by failing to maintain the oil tank. See Cobra Prods., Inc. v. Fed. Ins., 317 N.J. Super. 392, 401 (App. Div. 1998) ("The insurer has the burden of establishing application of an exclusion."). To the contrary, the evidence on

summary judgment revealed that plaintiff continually employed professionals to service the tank and she followed their recommendations. Allstate provided no suggestion as to what more plaintiff could have done under the circumstances. Moreover, there was no evidence that <u>at its inception</u>, the leak did not begin suddenly. The fact that it lasted for years did not make it anything less than "sudden and accidental."

Because we agree with plaintiff that she was entitled to coverage under the "sudden and accidental" exception we need not reach her remaining arguments.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1472-18T2